In the
United States Court of Appeals
For the Seventh Circuit

No. 98-1281

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARCUS C. DURHAM,

Defendant-Appellant.


Appeal from the United States District Court
for the Southern District of Illinois.
No. 96 CR-40051--William D. Stiehl, Judge.


Argued December 9, 1999--Decided May 1, 2000



        Before POSNER, Chief Judge, and COFFEY and MANION,
Circuit Judges.

        COFFEY, Circuit Judge.  On January 22, 1997, a
federal grand jury returned a one-count
superceding indictment charging Defendant-
Appellant Marcus Durham ("Durham") with
conspiring to distribute and possess with intent
to distribute cocaine and cocaine base, in
violation of 21 U.S.C. sec.sec. 841(a)(1),
846./1 After two mistrials resulting from hung
juries, the third trial commenced on October 21,
1997, and two days later, the jury returned a
verdict of guilty. On January 30, 1998, the court
sentenced the defendant to 420 months'
imprisonment, a supervised release term of 10
years and a $3,500 fine. Five days later, Durham
appealed, claiming that: (1) the prosecutor made
improper remarks during closing argument, thereby
depriving him of a fair trial; and (2) the court
improperly calculated the amount of drugs
attributable to him. We AFFIRM.

I.  BACKGROUND

        The Cairo, Illinois Police Department, the
Federal Public Housing Drug Task Force and the
Federal Bureau of Investigation commenced an
investigation in 1994 that disclosed that Durham
was a distributor of kilogram quantities of
cocaine and cocaine base (commonly referred to as
"crack") in southern Illinois. As a crack dealer,
the defendant had numerous customers, including

one Ronnie Bridges ("Bridges") and another person known as Bradley Bigham ("Bigham"), both of whom later testified against Durham at his third trial.

The investigation revealed that Durham employed Michael Bowers ("Bowers"), a child who was but 15 years old at the time he commenced working for Durham in 1993. In addition to providing Bowers with cocaine and crack for sale, Durham took him along on at least two trips to purchase crack in Charleston, Missouri. At the defendant's direction, Bowers hid the purchased crack in his underwear because, as Durham explained to him, "I was younger and the police wouldn't really mess with me." During the second return drug transportation trip from Charleston, the defendant directed Bowers to carry a "brick like package," which Durham told him contained one kilogram of crack cocaine. When they arrived in Illinois from Charleston, Durham paid Bowers $100 for carrying the crack.

On January 22, 1997, a federal grand jury issued a one-count superceding indictment charging Durham with conspiring to distribute and possess with intent to distribute cocaine and cocaine base./2 On October 21, 1997, a third trial commenced, with the government presenting some thirty witnesses consisting of a number of the defendant's fellow drug dealers, employees, former customers, and law enforcement officers, each testifying that they were either engaged in, observed or had been told about crack transactions that directly involved Durham.

When the defense presented its case, the defendant's brother, Darcy Durham, testified that the defendant's unexplained wealth was accumulated by "doing odd jobs" and that the expensive jewelry he wore "could have been gifts." Darcy Durham also testified that he "had no idea" who might have given his brother such gifts and that the most he had ever known his brother to earn from his jobs was a "couple hundred dollars."

In his closing argument, the prosecutor described Darcy Durham as a "dope dealer" himself and also a "liar." The prosecutor also described the defendant, who refused to testify, as a "slick little dope dealer" who "uses kids and exploits them to peddle poison," and asked the jury to use some "good midwestern common sense" in analyzing the evidence. None of these comments drew an objection from the defendant either during trial or on post-trial motion.

Nonetheless, at the close of trial, the district court instructed the jury that

[c]losing arguments are for the purpose of discussing the evidence. Opening statements, closing arguments and other statements of counsel should be disregarded to the extent they are not supported by the evidence.

On October 23, 1997, the jury returned a guilty verdict. Prior to sentencing, Durham objected to the Presentence Investigation Report ("PSR"), which attributed 1.65 kilograms of crack to him. Of the 1.65 kilograms of crack attributed to Durham as relevant conduct, the PSR attributed 1000 grams (one kilogram) to the defendant based on statements Bowers made to the police and his testimony during trial. On January 30, 1998, Judge Stiehl conducted a sentencing hearing, and while adopting the PSR's recommendations in their entirety, the judge concluded that Durham was responsible for even more crack than set forth in the PSR--the court attributed in excess of 2.5 kilograms to his relevant conduct./3 The court sentenced Durham to 420 months' imprisonment, a supervised release term of 10 years and a fine of $3,500. The defendant appealed.

II.  ISSUES

On appeal, the defendant claims that: (1) the prosecutor made improper remarks during closing argument, thereby depriving him of a fair trial; and (2) the trial court improperly calculated the amount of drugs attributable to him.

III.  DISCUSSION

A.  The Prosecutor's Closing Argument

Durham claims that the government's comments made during closing argument denied him a fair trial. We employ a two-part test for assessing the propriety of remarks made during closing argument: first, we determine whether the comments, examined in isolation, were improper. See United States v. Morgan, 113 F.3d 85, 89 (7th Cir. 1997). If we determine that when considered in isolation the remarks were indeed improper, we then examine the remarks in the light of the entire record and determine if the defendant was deprived of a fair trial as a result. See United States v. Granados, 142 F.3d 1016, 1021 (7th Cir. 1998). Because the defendant failed to object to the prosecutor's closing argument statements during trial, we review these allegedly improper remarks for plain error. See United States v. Laurenzana, 113 F.3d 689, 695 (7th Cir. 1997). Under this standard, our discretion to correct plain error should be employed only "in those circumstances in which a miscarriage of justice would otherwise result, namely, in those cases in

which the error has affected the outcome of the district court proceedings." See id. (citing United States v. Olano, 507 U.S. 725, 734-36 (1993)).

The defendant essentially complains that during closing argument, the prosecutor referred to him as a "slick little dope dealer" who "uses kids and exploits them to peddle poison." The defendant also challenges the prosecutor's reference to his brother, Darcy Durham, as a "dope dealer" himself and a "liar," and the prosecutor's plea to the jury's "good midwestern common sense" in analyzing the evidence. From our review of the record, we are convinced that when looked at in isolation, the prosecutor's comments were not improper.

From our review of the record and the applicable caselaw, we are convinced that there is nothing objectionable in the prosecutor's description of the defendant as a "slick little dope dealer" who "uses kids and exploits them to peddle poison" because the remarks were supported by the evidence. We have held that so long as the evidence supports the comments, prosecutors may speak harshly about the actions and conduct of the accused. See United States v. Aldaco, 201 F.3d 979, 989 (7th Cir. 2000); United States v. Cook, 432 F.2d 1093, 1096 (7th Cir. 1970). Indeed, this Court has affirmed similar strongly worded descriptions of defendants made by prosecutors. See, e.g., United States v. Spivey, 859 F.2d 461, 466 (7th Cir. 1998) (finding that the prosecutor's characterization of the defendants as "con men" was not improper); United States v. Fike, 538 F.2d 750, 758-59 (7th Cir. 1976) (finding that the prosecutor's statement that the defendant "has committed a dastardly crime, he should be punished" was not improper). See also United States v. Catalfo, 64 F.3d 1070, 1080 (7th Cir, 1995) (holding that a prosecutor's description of the defendant as a liar was not improper). It remains the longstanding principle of this Circuit that:

The district attorney is quite as free to comment legitimately and speak fully, although harshly, upon the action and conduct of the accused, if the evidence supports his comments, as is the accused's counsel to comment upon the nature of the evidence and the character of the witnesses which the government produces and which is favorable to him.

See Cook, 432 F.2d at 1106-07.

During trial, substantial evidence was presented that established Durham's drug activity and his employment of the child Bowers, who started

selling drugs for him in 1993 at the young age of 15 years. Obviously, "the prosecutor's statements were simply a permissible comment upon what the evidence showed," see United States v. Auerbach, 913 F.2d 407, 418 (7th Cir. 1990) (holding that it was not improper for the prosecutor to comment that a defendant "is guilty" and "has done what he is charged with"), and, hence, were not improper.

Likewise, with regard to the reference to Darcy Durham as a "dope dealer" himself and a "liar," the prosecutor was commenting on the credibility of one of the defendant's witnesses. The record reflects several material inconsistencies in Darcy Durham's testimony; for example, on cross examination, Darcy Durham was unable to account for the defendant's wealth. In fact, when asked about his brother's expensive jewelry, he testified that they "could have been gifts," but the most he had ever known his brother to earn from his jobs was only a "couple hundred dollars." Commenting on his own wealth, Darcy Durham testified that he made a living by selling cars, but could neither identify nor remember what type of cars he sold other than a single Ford Mustang. Also, Thomas Spiller, a Cairo, Illinois police officer in 1995, testified that he had observed on one occasion Darcy Durham and the defendant with what appeared to be a large quantity of crack cocaine and money in plain view inside Darcy Durham's residence. Each of these facts and inconsistencies affected Darcy Durham's credibility as a witness and were properly brought out by the prosecutor during his summation. As we have previously held, a prosecutor may remark on a witness' credibility "as long as the comment reflects reasonable inferences from the evidence adduced at trial." United States v. Morgan, 113 F.3d 85, 89 (7th Cir. 1997) (quoting United States v. Goodapple, 958 F.2d 1402, 1409-10 (7th Cir. 1992)); see also United States v. Catalfo, 64 F.3d 1070, 1080 (7th Cir. 1995) (stating that where a defendant's version of the facts conflicts with that of the government witnesses', a prosecutor may argue that the jury should believe the government witness and not the defendant). Because of his inconsistent trial testimony and evidence of his drug activity, we conclude that the prosecutor's comment describing Darcy Durham as a "liar" and a "dope dealer" himself were reasonably inferable from the evidence presented at trial and thus, were not improper.

Lastly, the prosecution's plea for the jury to use its "good midwestern common sense," hardly constitutes misconduct because it could have easily benefitted the defendant, a fellow "midwesterner" himself, as much as the

prosecution. Morever, it is well established that "juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. . . . While common sense is no substitute for evidence, . . . common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence." United States v. Magana, 118 F.3d 1173, 1201 (7th Cir. 1997) (citation omitted). Accordingly, we conclude that the prosecutor's appeal to the jury's "good midwestern common sense" also was not improper.

But even if we were to assume only for the purposes of this review that all these comments were improper, we would still conclude that the allegedly improper comments did not deprive the defendant of a fair trial because "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (emphasis added). To determine whether the remarks denied the defendant a fair trial, we consider five factors: (1) the nature and seriousness of the prosecutorial misconduct; (2) whether the conduct of the defense counsel invited the prosecutor's remarks; (3) whether the trial court's instructions to the jury were adequate; (4) whether the defense was able to counter the improper arguments through rebuttal; and (5) the weight of the evidence against the defendant. See Grandos, 142 F.3d at 1022.

Here, the prosecutor's characterization of Durham's brother, the chief defense witness, as a "dope dealer" himself and a "liar" appears to have been in response to the defense counsel's similar attack against the government's witnesses: "Members of the jury, these people are thieves, burglars, drug dealers, crack addicts, and now suddenly they are going to be truthful people. Suddenly now they gain character and they are going to be honest. Come on, they are lying to get a deal."

It is also evident from the record that the court's instructions adequately informed the jury that:

Closing arguments are for the purpose of discussing the evidence. Opening statements, closing arguments and other statements of counsel should be disregarded to the extent they are not supported by the evidence. . . . You may draw such reasonable inferences as you believe to be justified from proven facts. . . . You should not be influenced by sympathy, prejudice, fear or

public opinion.

(emphasis added). Cf. United States v. Stillo, 57 F.3d 553, 557 (7th Cir. 1995) (holding that a criminal defendant "must rebut the dual presumption that a jury will (1) capably sort through the evidence and (2) follow limiting instructions from the court").

Further, the comments describing the defendant as a drug dealer and the plea to the jury's "midwestern common sense" were initially made during the prosecution's opening summation, thus affording the defendant's counsel an opportunity to respond. Finally, the overwhelming weight of the evidence against the defendant more than adequately supports his conviction. Some thirty witnesses, consisting of former employees and customers, as well as law enforcement agents, testified with specificity and detail about Durham's dealings in cocaine and crack.

But as previously discussed, because Durham failed to object to the prosecutor's comments at the time they were made, we also rule that he has waived the issue on appeal and, thus, any review comes under the plain error standard. Accordingly, Durham must establish "not only that the remarks denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remarks." See Granados, 142 F.3d at 1022. We are convinced that the prosecutor's comments describing the defendant as a "slick little dope dealer" who "uses kids and exploits them to peddle poison," as well at the comments attacking Darcy Durham's credibility and appealing to the jury's "midwestern common sense" had little to do with the outcome of the proceedings. Thus, in light of the overwhelming and extensive evidence that implicated him in the offense charged, Durham has failed to persuade us "not only that the remarks denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remarks." Id. We therefore decline to vacate his conviction on account of these remarks.

B. Durham's Challenge to the Court's Drug Quantity Calculations

The defendant also claims that the court improperly calculated the amount of crack attributable to him. We review a district court's determination of the amount of narcotics attributable to a defendant for sentencing purposes under the clear error standard. See United States v. Johnson, 200 F.3d 529, 537 (7th Cir. 2000). "'The factual findings of the district court will not be overturned unless they are clearly erroneous . . . . Thus, we will

reverse the district court's conclusion as to quantity of cocaine attributable to [a] defendant[ ] only if we have a definite and firm conviction that the district court made a clear error in sentencing.'" United States v. Taylor, 72 F.3d 533, 542 (7th Cir. 1995) (quoting United States v. Mumford, 25 F.3d 461, 465 (7th Cir. 1994)).

The reasons for this deferential standard of review are well-established. Congress has mandated this standard of review in sentencing and stated that "the court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. sec. 3742(e) (emphasis added). As a matter of sound jurisprudence, we do not second-guess the sentencing judge because he or she has had "the best 'opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record."

United States v. Garcia, 66 F.3d 851, 856 (7th Cir. 1995) (emphasis added).

Thus, because "the district court, as the trier of fact, not only has the authority but is in the best position to determine the amount of narcotics attributable to the [defendant]," the clearly erroneous standard applies to estimates of drug quantities made for sentencing purposes. Id. (alteration in original).

Based on the PSR and the trial testimony, the sentencing judge attributed "in excess of 2 and a half kilograms of crack cocaine" to Durham's relevant conduct, well above the amount required for the maximum base offense level of 38. U.S.S.G. sec. 2D1.1(c)(1) (requiring only "1.5 KG or more of Cocaine Base" for the maximum base offense level of 38). Although Durham challenges the testimony of four of the government's witnesses, his most significant challenge is to Bowers' testimony which was used by the sentencing judge to attribute 2,040 grams (2.04 kilograms) of crack to Durham. Therefore, because Bowers' testimony represents the bulk of the total amount of crack cocaine attributed to the defendant, we initially address the defendant's challenge to this testimony./4

At the conclusion of the sentencing hearing, the judge found that:

Michael Bowers, when he testified at trial, stated that he started dealing in crack for the defendant in the summer of 1993 and that he got fronted by the defendant 5 grams two or three times a week. He didn't sell during the summer of 1994, nor in the colder time of 1995, so a conservative analysis of that would show that he sold 5 grams twice a week, or 10 grams a week, over a period of, if we only count two years, 52 weeks times two years makes it 1,040 grams. One time he went with the defendant to Charleston to pick up the crack and another time he went--the defendant said that the package he received from the source in Charleston was one brick or one kilogram of crack cocaine, so the total that Mr. Bowers was involved with [Durham] was 2,040 grams.

(emphasis added). Durham argues that the court failed to make an explicit finding as to how it arrived at its conclusion that he fronted "5 grams [of crack] two or three times a week." We have held that "estimates of drug quantity are acceptable if they are based on evidence possessing a sufficient indicia of reliability and not nebulous eyeballing." United States v. Pigee, 197 F.3d 879, 889 (7th Cir. 1999) (quotations omitted). In fact, it is also permissible for a court to take witness' estimates of the amount of drugs they purchased and multiply that by the minimum quantity sold on each occasion, as well as extrapolate drug quantities from the amount of money used to purchase the drugs. See United States v. Howard, 80 F.3d 1194, 1204 (7th Cir. 1996). At trial, Bowers testified that he received $500 worth of crack (made up of approximately 25 $20 crack rocks) twice a week from the defendant. Incorporating the PSR's conclusion that "[w]ithin this conspiracy, a $20 rock consisted of approximately 0.2 gram," it seems evident that the court's calculations accurately reflected the evidence presented at trial./5 Thus, we conclude that the sentencing judge's calculations are supported by the record and based on evidence that revealed a sufficient "indicia of reliability." See id.

Durham also argues that Bowers' testimony in relation to the weight of the brick of crack that Bowers transported from Missouri to Illinois is unreliable because he provided contradictory statements to federal drug agents. The defendant points out that during the third trial, Bowers described the crack that the defendant gave him to bring back to Illinois as a "brick like

package," but was unable to testify as to its weight. Durham claims that this testimony contradicts the statement Bowers gave to federal drug agents on April 16, 1997, when he stated that "Durham told [him] the package contained one kilogram of crack cocaine."

These statements, however, are not contradictory; Bowers' description of the crack as a "brick like package," but not knowing how much it weighed, is entirely consistent with having been told by Durham that the package contained one kilogram of crack. Also, it is important to keep in mind that many of these witnesses, including Bowers, were former associates and friends of the defendant and their testimony, although truthful, can at best be described as reluctant. Nonetheless, it is clear from the record that Bowers' statements to federal drug agents and during trial, consistently identified the crack that he transported for Durham from Charleston, Missouri to Illinois as "a brick like package," and nothing in his trial testimony contradicts his statement to federal drug agents that he was told by Durham that the package contained one kilogram of crack. Further, the defendant is essentially questioning Bowers' credibility, which is plainly a waste of our time in light of our strong preference to defer to the trier of fact on such matters. See United States v. Mancillas, 183 F.3d 682, 701 n.22 (7th Cir. 1999) ("We do not second-guess the [sentencing] judge's credibility determinations. . . .") (alteration in original); Garcia, 66 F.3d at 856. As we have previously stated, "arguments which simply urge a reassessment of a district court's credibility determinations are wasted on an appellate court." United States v. House, 110 F.3d 1281, 1286 (7th Cir. 1997).

Thus, "[i]n the absence of actual evidence controverting the information in the PSR" and the evidence presented at trial, we conclude that the sentencing judge's finding that based on Bowers' testimony to federal drug agents and at trial, the defendant's relevant conduct involved 2.04 kilograms of crack, was not clearly erroneous. See United States v. Taylor, 72 F.3d 533, 547 (7th Cir. 1995). Because this amount of crack is well in excess of the 1.5 kilograms required under the sentencing guidelines for the maximum base offense level of 38, which Durham was assessed, we need not address his remaining challenges to the court's drug calculations.

IV. CONCLUSION

We AFFIRM the defendant's conviction and sentence.

/1 The indictment charged Durham with engaging in this conspiracy from February 17, 1993, continuing until on or about April 30, 1996.

/2 The government's initial attempts to prosecute Durham were unsuccessful--at the conclusion of the trials, the juries were deadlocked and the judge declared mistrials.

/3 The judge increased the quantity of crack attributed to the defendant from what was recommended in the PSR, and held that Durham was responsible for in excess of 2.5 kilograms of crack (as opposed to the 1.65 kilograms recommended in the PSR). The court's finding, however, did not alter the defendant's resulting offense level because under U.S.S.G. sec. 2D1.1(c)(1), "1.5 KG or more of Cocaine Base" attributed to a defendant results in a base offense level of 38.

/4 Durham also attacks the testimony of three other witnesses: Bridges, Bigham and Cameron Shaw ("Shaw"). The court attributed 255.15 grams of crack to the defendant based on Bridges' testimony, 56.7 grams of crack based on Bigham's testimony and 113.4 grams of crack based on Shaw's testimony, for a total of 425.25 grams. Bowers' testimony, however, was used by the court to attribute 2.04 kilograms of crack to the defendant. Thus, even if we were to accept as true, which we emphatically do not, the defendant's challenges to the drug quantity calculations based on the testimony of Bridges, Bigham, and Shaw, it could not possibly affect his sentence because the total amount of crack attributable to Durham would still be well in excess of the 1.5 kilograms required for the maximum base offense level.

/5 It appears that the defendant bases his argument that the court was inconsistent in its drug calculations, in part, on what appears to be a single typo in the sentencing hearing transcript. (Tr. 1/30/98, at I-23) (stating incorrectly that a $20 rock equals "another .12 grams"). From our review of the record and each of the judge's calculations, we conclude that the judge consistently applied the PSR's conclusion that "a $20 rock consisted of approximately 0.2 gram" in calculating the quantity of drugs attributable to the defendant's relevant conduct.