# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 01-3857, 01-3919 & 01-4368

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ANGELO CASSANO, NORMAN "RANDY" WILLIAMS, and CLARENCE CROSS,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 99 CR 836—**Blanche M. Manning**, *Judge.*

_____

ARGUED JANUARY 7, 2003—DECIDED JUNE 16, 2004

_____

Before COFFEY, ROVNER, and EVANS, *Circuit Judges.*

COFFEY, *Circuit Judge.* On March 21, 2000, a federal grand jury returned a twenty-four count superceding indictment against Clarence Cross, Norman "Randy" Williams, Angelo Cassano, and three other defendants, stemming from an alleged conspiracy to defraud Continental Casualty Company, a subsidiary of CNA Financial Corp. ("CNA"). The indictment sets forth, among other things, that from August 1995 to July 1997, the defendants caused approximately $3.8 million in misap-

propriated funds to be paid to three fictitious entities. Cross, Williams, and Cassano elected to stand trial, while their three co-defendants pled guilty. On May 10, 2001, following a three-week trial, the jury entered guilty verdicts against all three defendants on all counts. The defendants appeal their convictions. We affirm.

## I.  BACKGROUND

From 1986 to 1997, Clarence Cross was employed in the mail room of a large Chicago-based insurance company, CNA Financial Corporation. In 1995, Cross was the supervisor in charge of outgoing mail services at CNA. Cross' responsibilities included arranging for the outsourcing of various printing, sorting, and mailing functions, which CNA utilized to correspond with current and prospective clients. In conjunction with these duties, Cross was personally authorized to issue checks to vendors in amounts up to $1,000. Checks for amounts greater than $1,000 required the authorization of Cross' supervisor, Beverly Stephenson. Evidence submitted at trial establishes that between August 1995 and July 1997 (when Cross was discharged) CNA issued some 400 checks representing approximately $3.8 million to three fictitious entities: Fidelity Graphics; Eagle Mailing; and P&N Presort. At no time did any of these companies render any mail-related services to CNA. Once issued, Cross, with the help of Williams, Cassano, and his three other co-defendants, cashed the checks and retained the proceeds.

### A.  Cassano's Role in the Conspiracy

In the early 1980s, defendant Angelo Cassano became acquainted with a man by the name of William White. The two were casual friends; they played golf together ten to fifteen times per year and occasionally shared dinner and

drinks. William White was also acquainted with Clarence Cross, who had enlisted White's assistance in the cashing of the fraudulent CNA checks.

As part of the scheme to defraud CNA, White set up a shell corporation known as Eagle Mailing. Eagle Mailing had no active business operations at all; the entity was only used as a vehicle for the issuance and eventual conversion of CNA checks into cash. In order to facilitate the scheme, White opened a bank account and a United States Post Office Box under the aliases William Kelly and William Reinhardt. White also obtained under the name Bill Thompson a pager to effectuate communications between himself and the other conspirators.

In September of 1995, after consulting with Cross, White began receiving checks from CNA made out to Eagle Mailing at his Arlington Heights, Illinois P.O. Box. After receiving the checks, White would either: endorse the checks to cash, endorse them to his assumed identity, William Reinhardt, or endorse them to Precision Data (another fictitious entity White had created). Then he would either take them to a bank or a currency exchange to have them cashed. All of the checks were made out for amounts less than $10,000, specifically to avoid Internal Revenue Service currency transaction reporting requirements under 31 C.F.R. § 103.22.

This process continued, with White cashing CNA checks once or twice per week, until February of 1996, when White found out he would be going back to prison. White had violated his probation on an earlier forgery and credit card fraud charges in DuPage County, Illinois with a DUI conviction, and he was sentenced to a three-year term in the Illinois Department of Corrections. This is when Cross sought Cassano's help in continuing the fraudulent cashing of CNA checks in his absence.

Approximately a month before he was to begin serving his sentence, White approached Cassano at the Bella Notte Restaurant in Morton Grove, Illinois, of which Cassano was the owner-operator. White testified that Cassano was not the first, but the third person, he had approached regarding the cashing of the checks. In their first meeting, White told Cassano that he had a friend, William Reinhardt (also White's assumed identity), who was going through a messy divorce and that, in order to conceal his assets, the friend was writing White checks to cash for him. White also assured Cassano that the checks were "good" (as in they would not bounce), but the pair did not discuss whether the arrangement would be legal. Cassano responded by telling White that he would have to ask around and see if he knew somebody who would help cash the checks.

At their next meeting, also at his restaurant, Cassano agreed to help and informed White that he had found a place to cash the checks, the Stone Park Currency Exchange. Subsequently, White spent approximately three months in prison, February to May of 1996. During that time, the record shows that Cassano cashed five checks totaling approximately $40,000. White testified that he neither asked for, nor was he offered, the proceeds from these checks. White also testified that although he filled out the date and signature on the checks cashed during the period he was in jail, someone else had filled in the amounts. Each check cashed during this period, as well as those that followed, were less than the $10,000 currency transaction reporting requirements.

Following White's release from prison, Cassano continued to cash CNA checks at the Stone Park Currency Exchange. Evidence presented at trial suggests White would page or call Cassano approximately once a week to let him know that there was a CNA check that needed to be cashed. Cassano would then meet White in the parking lot of the Stone Park Currency Exchange whereupon Cassano would

go in and cash the check while White waited. The record suggests that Cassano was not initially compensated for his efforts. However, not long after White's release from jail, Cassano requested he be paid for cashing the checks. White initially demurred to Reinhardt (who was in reality White) but a week later began paying Cassano $100 to $500 per check.

The owner of the Stone Park Currency Exchange, Charles Salvatore, testified that beginning in early February of 1996, Cassano indeed brought in the first of some fifty-one second-party checks, totaling approximately $296,000, made out to Eagle Mailing and endorsed by William Reinhardt (a.k.a. William White). In addition, Salvatore and his employee, Yolanda Scott, testified that persons presenting second-party checks (checks made out to and endorsed by someone other than the person presenting them) were normally required to sign the checks as well. However, when asked to do so, Cassano had refused to sign, assuring Scott that the checks were "good" and that he had cleared it with (his friend) Salvatore. All of the checks were in fact "good" in that they cleared, and Cassano was allowed to repeat this procedure fifty-one times. Salvatore testified that on at least two occasions he conveyed his concern over the volume of money being paid out on Cassano's check and the possible motive for such transactions. On each occasion Cassano assured Salvatore that there was nothing to worry about and that the checks would be paid.

Salvatore and Scott also testified that Cassano was never required to complete a Currency Transaction Report. As mentioned above, Cassano and White took great care in making sure that all the checks cashed at the Stone Park Currency Exchange were in denominations less than $10,000. However, bank records show that on two separate occasions, October 17, 1996, and November 27, 1996, the Stone Park Currency Exchange cashed two CNA checks in one day that totaled more than $10,000, thereby triggering

currency transaction reporting responsibilities under the Treasury Regulations.[1] Under the regulations, these transactions required the completion of a copy of IRS Form 4789, Currency Transaction Report, which was never filled out. At trial, two witnesses, White and Frank Amanti (one of the original co-defendants and a restaurant owner), testified that the $10,000 IRS reporting threshold was common knowledge in the restaurant business. Salvatore testified that he didn't think any of Cassano's transactions required the completion of a Currency Transaction Report.

In July of 1997, CNA Investigator Frank Erion and Agent John Teeling from the Federal Bureau of Investigation both paid visits to the Stone Park Currency Exchange. Following each visit Salvatore called Cassano, who continued to assure him that the checks were "good," that nothing was wrong, and that he was simply helping out his friend, Reinhardt, who was going through a nasty divorce.

On March 16, 2000, Cassano was charged, along with the co-defendants, in a twenty-four count superceding indictment with mail fraud, in violation of 18 U.S.C. §§ 1341, 1342, conspiracy to commit money laundering, in violation of 31 U.S.C. § 1956(h), and structuring of currency transac-

---

[1]  The Treasury Regulations state in pertinent part:

> Multiple transactions—general. In the case of financial institutions other than casinos, for purposes of this section, multiple currency transactions shall be treated as a single transaction [and therefore are required to be reported] if the financial institution has knowledge that they are by or on behalf of any person and result in either cash in or out totaling more than $10,000 during any one business day . . . . Deposits made at night or over a weekend or holiday shall be treated as if received on the next business day following the deposit.

31 C.F.R. § 103.22(c)(2).

tions, in violation of 31 U.S.C. §§ 5324(3) and 5322(a). The mail fraud charges were later dismissed, but Cassano pled not guilty to the other counts and stood trial along with Cross and Williams. Cassano was convicted on all counts and sentenced to sixty-three months imprisonment and ordered to pay $296,920 in restitution.

## B. Williams' Role in the Conspiracy

Sometime in the early 1980s, Norman "Randy" Williams, became acquainted with Clarence Cross. Subsequently, they carried on a personal and professional relationship. At the time, Williams was working as a manager/supervisor for his father's printing business, Fidelity Bindery, as well as working as a sales rep for a trucking company. In 1993, Cross was a supervisor in the transportation department at CNA, at the same time Williams was moonlighting as a broker for a trucking company. Cross helped Williams secure some trucking work with CNA, shipping goods throughout the country. This marked the beginning of Williams' interaction with CNA.

In 1993, Williams' father, Earl Williams, handed over the day-to-day operations of Fidelity Bindery to Williams. This included keeping the books for Fidelity Bindery. Earl Williams testified that although he would visit the office periodically, it was Randy who ran the business.

In 1995, CNA transferred Cross to a supervisory role in the mail department. In conjunction with his new role, Cross suggested a relationship between Fidelity Bindery and CNA graphics might be mutually beneficial and desirable. Cross suggested CNA was eager to demonstrate minority participation in conjunction with their graphic arts department.

In mid-August 1995, Cross made two visits to Fidelity Bindery. During his first visit Cross inspected the operations and suggested that CNA might want to hire Fidelity

Bindery to do some cutting, sorting, and mailing work for them. However, the next day Cross informed Williams that the contracts for the mail work had already been awarded, but he proposed an alternative arrangement.

Cross suggested CNA was still interested in having a minority-owned business involved in its printing and mailing activities. Therefore, he allegedly told Williams that CNA would pay him for filling out some invoices for work performed by other contractors, while Williams and Fidelity would do no work at all. In return for his meager efforts he would be entitled to keep a full 30% of the funds from each check, while 70% was to be returned to Cross in cash.[2] In any case, Williams was unable to produce any invoices prepared or work actually performed on behalf of CNA.

From August 1995 until May of 1997, Williams cashed approximately $1,300,000 in CNA checks. According to Williams' testimony, he deposited the first few checks, totaling approximately $270,000, that he received from Cross into Fidelity Bindery's bank account. However, in June of 1996 he opened another bank account in the name of Fidelity Graphics.[3] Thereafter, the Fidelity Graphics account was used exclusively to cash CNA checks and funnel the proceeds to Cross and Williams. Williams used the proceeds from the CNA checks to purchase jewelry, life insurance, real estate, an interest in a Chicago restaurant, and other personal investments. Williams did disclose the

---

[2] At which point, according to Williams, Cross claimed he would use the cash to compensate the third-party subcontractors that Williams was allegedly preparing the invoices for.

[3] Earl Williams testified that although he had contemplated getting into the graphics business and had printed up business cards with the name Fidelity Graphics on them, Fidelity Graphics, to his knowledge, never conducted any business operations.

proceeds from the checks on his income tax returns for fiscal years 1995, 1996, and 1997; however, the income was offset with a number of fraudulent deductions for business expenses that were never incurred.[4]

After Cross was dismissed from his position at CNA in July of 1997, Williams stopped receiving checks. Then, on August 7, 1997, an investigator for CNA paid Williams a visit. Williams claimed that the work he was performing for CNA was legitimate. He claimed to be processing mail, but he could not show the investigator any examples of work performed, nor was he able to produce any invoices generated. However, Williams did explain that he paid 65% of each check, in cash, to a CNA employee.

On March 16, 2000, Williams was charged with mail fraud, in violation of 18 U.S.C. §§ 1341, 1342, conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h), three counts of money laundering, in violation of 18 U.S.C. § 1957(a)(1) and (2), and three counts of tax fraud, in violation of 26 U.S.C. § 7206(1). Williams pled not guilty and was convicted on all counts. He was sentenced to fifty-seven months imprisonment and ordered to pay $1.312 million in restitution.

### C. Cross' Role in the Conspiracy

As illustrated above, Cross was the mastermind and co-ordinator of the conspiracy to defraud CNA. Over a three-year period Cross caused CNA to issue more than 400 checks made payable to three fictitious entities: Fidelity Graphics, P&N Presort and Eagle Mailing. Cross enlisted the help of White and Cassano to effectuate the cashing of

---

[4] According to Williams' accountant, Williams lied about the nature of the CNA transactions as well as business expenses he claimed were incurred in producing the income.

checks through Eagle Mailing and, with Williams' help, cashed checks through Fidelity Graphics. In addition, Cross directed the creation of a third fictitious entity, P&N Presort, for the sole purpose of cashing CNA checks.

In August 1996, Cross directed Julio Munoz[5] to file documents with the Illinois Secretary of State creating P&N Presort. Also at Cross' direction, Munoz opened a post office box and a bank account in the name of the newly created entity. This allowed Cross to arrange the mailing of CNA checks directly to the post office box. Once the checks arrived, Munoz would pick them up and deposit them in P&N Presort's bank account.

In addition to Munoz's assistance, Cross enlisted the help of local restaurant owner Frank Amanti[6] to convert checks drawn on P&N Presort's account into cash.

Munoz testified that he provided Cross with a number of blank P&N Presort checks. Cross furnished Amanti with endorsed checks made payable to one of six fictitious entities. The checks were all made out for less than $10,000; again this was done to avoid having to complete a Currency Transaction Report.[7] Amanti would cash the checks at a currency exchange keeping approximately $100 per check for himself, giving Munoz approximately $200 per check and providing Cross with the remainder. From August 1996 to July 1997 CNA made payments to P&N Presort totaling

---

[5] Munoz was originally named in the grand jury indictment, but pled guilty and testified at trial pursuant to a cooperation agreement with the government.

[6] Amanti was also an original defendant in this litigation and testified pursuant to a grant of immunity after pleading guilty to mail fraud and structuring financial transactions.

[7] Amanti testified that currency transaction reporting requirements are "common restaurant knowledge." R. 1313.

approximately $840,000. Munoz and Amanti converted two checks per week into cash until July of 1997, when CNA fired Cross.

Cross was indicted on three counts of mail fraud, in violation of 18 U.S.C. §§ 1341, 1342, two counts of conspiracy to launder money instruments, in violation of 18 U.S.C. § 1956(h), six counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1) and (2), and three counts of tax fraud, in violation of 26 U.S.C. § 7203. Cross pled not guilty and was convicted on all counts. Cross was sentenced to a total of 135 months imprisonment and ordered to pay $3.8 million in restitution.

## II. ANALYSIS

Cassano, Williams and Cross all raise issues on appeal. Cassano claims: (1) the district court erred in denying his motion for acquittal on conspiracy to commit money laundering and structuring of currency transaction charges; (2) the district court erred in failing to declare a mistrial based on improper statements made during closing arguments; (3) the district court improperly allowed hearsay evidence during the testimony of a co-defendant; and (4) that two of the counts in the indictment on structuring of currency transaction charges were multiplicitous. Similarly, Williams claims: (1) the district court erred in not granting his motion for judgment of acquittal; and (2) the district court should have granted his motion for a new trial because he was irremediably prejudiced by the court's denial of his motion for severance. Finally, Cross also claims the district court committed a reversible error when it denied his motion to sever. We consider each of these issues in turn.

*A. Cassano's Motion for Acquittal*

On appeal, Cassano first claims that the district court should have overturned the jury's determination of guilt and granted his motion for judgment of acquittal, because the government had failed to carry its burden on the conspiracy to commit money laundering and structuring of financial transactions charges.

This court reviews a district court's denial of a motion for acquittal *de novo. See United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). The evidence in the record is reviewed and all positive inferences therein are viewed in the light most favorable to the government. *See id.*; *United States v. Jones*, 222 F.3d 329, 351-52 (7th Cir. 2000). The decision of the district court will be disturbed "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Thompson*, 106 F.3d 794, 799 (7th Cir. 2000) (citing *United States v. Gutierrez*, 978 F.2d 1463, 1468-69 (7th Cir. 1992)). Circumstantial evidence alone, whether in conjunction with other inculpatory evidence or not, is sufficient to support a conviction. *See United States v. Gracia*, 272 F.3d 866, 874 (7th Cir. 2001). A defendant challenging the sufficiency of the evidence supporting his conviction "faces a very high hurdle because . . . we neither reweigh the evidence nor do we substitute our judgment of the facts for that of the fact-finder." *United States v. Crotteau*, 218 F.3d 826, 834 (7th Cir. 2000). We hold that Cassano has failed to meet this rigorous burden and discuss each of his claims in turn.

1.   Conspiracy to Commit Money Laundering

Cassano claims the government failed to carry its burden on the conspiracy to commit money laundering charges. We disagree.

Specifically, Cassano argues the government did not prove that he had the requisite *mens rea* under 18 U.S.C. § 1956(a)(1), which states in pertinent part:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be [guilty of a felony punishable by up to twenty years in prison and $500,000 in fines.]

§ 1956(a)(1). Thus, in order to secure a conviction under section 1956(a)(1), the government must prove beyond a reasonable doubt that the proceeds from a conspiracy were knowingly derived from some illegal activity. *See Gracia*, 272 F.3d at 873. Knowledge may be "proved by the defendant's conduct and by all of the facts and circumstances surrounding the case." *United States v. Fawley*, 137 F.3d 458, 469 (7th Cir. 1998). The defendant's knowledge may also be established if he "deliberately avoided learning the truth." *United States v. Inglese*, 282 F.3d 528, 537 (7th Cir. 2002).

According to Cassano, the government merely proved that he helped White cash checks for "William Reinhardt," whom he was told was concealing marital assets from his wife.[8] In

---

[8] The defense cites 720 Ill. Comp. Stat. Ann. 5/16-4(4) for the proposition that if White's story was taken by Cassano as true, Cassano was unaware of any underlying illegal activity because the concealment of marital assets by one spouse from another is not considered a theft under Illinois law if both parties reside in

(continued...)

addition, the defense asserts White "played Cassano like a violin with a very convincing overture," while convincing him the scheme was on the legitimate.

However, the great weight of the evidence establishes that Cassano knew, or should have known, that the proceeds of the checks had their origin in an unlawful activity. First, if Cassano believed he was providing a legal service to White, Cassano would not have refused to co-sign the checks himself when requested to do so by employees at the Stone Park Currency Exchange. Also, evidence that the checks were signed by William Reinhardt refutes Cassano's defense of ignorance. Cassano knew, or should have known, that White's story was false, because any rational person attempting to conceal the proceeds of a business from his or her spouse surely wouldn't personally endorse the checks.

Furthermore, the record shows that Cassano was paid, and paid very well, for minimal efforts. During the time White was in jail, Cassano cashed five checks worth $40,000. Cassano never turned the proceeds over to White and it was reasonable for the jury to assume that he retained the entire amount. In addition, subsequent to White's release from jail, Cassano was compensated, at his request, amounts ranging from $100 to $500 per check—rates which are well over the market rate for such services.[9] Also, there is no legitimate reason why, once he was out of

---

[8] (...continued)
the same abode at the time of the alleged theft. However, no evidence was presented suggesting White went into detail about "Reinhardt's" situation or that Cassano had any reason to believe such an arrangement was not, in fact, illegal.

[9] The owner of the Stone Park Currency Exchange, Charles Salvatore, testified that the going rate currency exchanges charged for check cashing services were approximately 1-1.6%, depending on the value of the check. A $500 fee on even a $9,500 check is in excess of 5.2%.

jail, White could not cash the checks on his own. In essence, Cassano was paid a fee for simply walking into the Stone Park Currency Exchange and presenting the checks.

The evidence presented a trial was sufficient to lead a "reasonable jury" to conclude that Cassano knew, or should have known, that the proceeds of the conspiracy were derived from unlawful activity. Therefore, we hold the district court did not err in denying Cassano's motion for acquittal on this issue.

2. Structuring Charges

Cassano also claims that the evidence presented to the jury was insufficient to uphold a conviction for structuring of currency transactions, in violation of 31 U.S.C. §§ 5324 and 5322. Cassano bases his argument on his assertion that he took no part in deciding what denominations the checks would be made out for and, therefore, he lacked criminal intent as to the structuring of the currency transactions to evade Treasury Department reporting requirements. We disagree.

Pursuant to 31 U.S.C. § 3513 the Secretary of the Treasury has promulgated regulations that require financial institutions, such as currency exchanges to "file a report of each deposit, withdrawal, exchange of currency or other payment or transfer . . . which involves a transaction in currency more than $10,000." 31 C.F.R. § 103.22(b)(1).[10] Federal law makes it illegal for any person to "for the purposes evading the reporting requirements . . . structure or assist in structuring, or attempt to assist in structuring,

---

[10] This report is commonly referred to as a Currency Transaction Report. The actual document which must be filed is Internal Revenue Service Form 4789.

any transaction with one or more domestic financial in-
stitutions." 31 U.S.C. § 5324. The treasury regulations
state:

> [A] person structures a transaction if that person, act-
> ing alone, or in conjunction with, or on behalf of, other
> persons, conducts or attempts to conduct one or more
> transactions in currency, in any amount, at one or more
> financial institutions, on one or more days, in any
> manner, for the purpose of evading the reporting
> requirements under section 103.22 of this Part. "In
> any manner" includes, but is not limited to, the break-
> ing down of a single sum of currency exceeding $10,000
> into smaller sums, including sums at or below $10,000,
> or the conduct of a transaction, or series of currency
> transactions, including transactions at or below
> $10,000. The transaction or transactions need not
> exceed the $10,000 reporting threshold at any single
> financial institution on any single day in order to con-
> stitute structuring within the meaning of this defini-
> tion.

31 C.F.R. § 103.11(gg). Criminal penalties of up to five
years in prison and a fine of up to $250,000 may be imposed
on any "person willfully violating" the currency reporting
requirements. 31 U.S.C. § 5322. This court has previously
articulated what constitutes willful violation of the currency
reporting requirements. Under this standard, in order to
sustain a conviction, the government must prove "only that
a defendant had knowledge of the reporting requirements
and acted to avoid them." *United States v. Jackson*, 983
F.2d 757, 767 (7th Cir. 1993).

It was entirely reasonably for the jury to conclude that
Cassano "had knowledge of the reporting requirements" and
that he "acted to avoid them." Cassano's partner in the
Bella Notte Restaurant, Frank Amanti, testified at trial
that the currency reporting requirements are "common

restaurant knowledge." Indeed, White testified that the reason he originally sought Cassano's help in cashing the checks was because Cassano was in the restaurant business and had access to financial institutions. In addition, the amount line of the checks Cassano cashed while White was in prison were not completed by White, thereby leading a reasonable jury to conclude that Cassano filled in these amounts. Finally, it is unlikely, to the point of absurdity, that it was pure coincidence that all fifty-one checks cashed by Cassano were in denominations under $10,000. There-fore, because it was reasonable for the jury to conclude that Cassano knew the currency reporting requirements and acted to avoid them, we hold the defendant has not carried his burden and the district court did not err in denying his motion for judgment of acquittal on the structuring of currency transaction charges.

### B. Cassano's Claims of Prosecutorial Misconduct in Closing Arguments

Cassano next claims the district court erred in not grant-ing his motion for a mistrial based on a number of state-ments made by the government during closing arguments, which he claims misstated both the law and the facts. Specifically, Cassano alleges the government engaged in misconduct during closing arguments by: (1) asserting that Cassano was aware that White had previously been con-victed of fraud and, in February of 1996, was going to jail in relation to that conviction; (2) improperly characterizing how long it took for Cassano to drive between his restau-rant and the Stone Park Currency Exhcange as a "short drive";[11] (3) stating that it was Cassano who decided "when

---

[11] This issue was raised by the defense in their Motion for New Trial and Arrest of Judgment. R. 224. However, the district court's

(continued...)

and how much" to cash the checks for when White was in prison; (4) implying that Cassano knew White's story about Reinhardt was false at the time White suggested Cassano cash checks for him;[12] and (5) stating that the government's whole case against Cassano hinged upon the jury's determination of whether the defendant know the money was "dirty." The district court ruled that a number of these statements were indeed improper. However, the court found that Cassano was not deprived of a fair trial because any prejudice caused by the statements was cured by the court's jury instructions. We review the denial of a motion for mistrial for abuse of discretion. *See Smith*, 308 F.3d at 739; *accord Magna*, 118 F.3d at 1183.

This Court undertakes a two-part inquiry to determine whether a district court's decision not to grant a mistrial based on statements made in summation was in error, asking: (1) whether the prosecutor's arguments, when viewed in isolation, were improper; and (2) if the comments are found to be improper, whether in light of the record, the remarks deprived the defendant of a fair trial. *See United States v. Aldaco*, 201 F.3d 979, 988 (7th Cir. 2000); *United States v. Cotnam*, 88 F.3d 487, 497-98 (7th Cir. 1996). In determining whether the defendant was deprived of a fair trial, we consider: "(1) the nature and seriousness of the prosecutorial misconduct; (2) whether the conduct of the defense counsel invited the prosecutor's remarks; (3)

---

[11] (...continued)
Memorandum and Order denying the defense motion did not specifically address this issue. Because the issue was in front of the district court in defendant's motion, but not specifically addressed, we assume the district court found the claim meritless and review only for abuse of discretion. *See United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002); *accord United States v. Magna*, 118 F.3d 1173, 1183 (7th Cir. 1997).

[12]  *See supra* note 11.

whether the trial court's instructions to the jury were adequate; (4) whether the defense was able to counter the improper arguments through rebuttal; and (5) the weight of the evidence against the defendant." *United States v. Durham*, 211 F.3d 437, 442 (7th Cir. 2000).

Assuming, *arguendo*, the district court was correct in concluding the prosecutor's statements were improper, application of the factors outlined in *Durham* to the facts of this case establish that the defendant was not deprived of a fair trial. Three of the factors outlined in that case weigh heavily in favor of the prosecution. Because we believe the prosecution's comments did not prejudice Cassano, or deprive him of a fair trial, we affirm.

Only two factors weigh in Cassano's favor. First, most of comments complained of by the defense occurred during rebuttal. Also, the government does not allege, and we do not find that the defense did anything to provoke these remarks. However, because the other three factors far outweigh the other two on the facts of this case, the defense's argument must fail.

As discussed above, the great weight of the evidence in this case suggests Cassano's guilt. For example, the fact that the prosecutor improperly suggested that Cassano was aware White had previously been in jail on fraud charges did prejudice the defense. The evidence presented at trial showed White and Cassano had been friends and golfing buddies for approximately ten years. A reasonable juror could conclude from this evidence alone that Cassano was well aware of White's criminal past. In addition, although there was no direct evidence that Cassano knew White was going back to jail in February of 1996 in relation to his prior fraud conviction—and not solely on the basis of a DUI conviction—the jury could have reasonably assumed that due, to the nature of their relationship, Cassano was aware of the White's nefarious past. Also, characterizing Cassano's

drive from his restaurant to the Stone Park Currency Exchange as "short" could not have prejudiced the jury. On their own, jurors could have reasonably concluded that Cassano's compensation of $100 to $500 per check was not fair compensation for his efforts. Likewise, the same can be said of the defense's other allegations of prosecutorial misconduct. At bottom, none of the alleged instances of misconduct were so serious as to offset the weight of the circumstantial evidence compiled against Cassano during the trial.

Similarly, any unfairness caused by the prosecutor's alleged improper statements was minimal. The defense does not allege, and we do not conclude, that any of the remarks made by the prosecution in summation were inflammatory or unconstitutional. *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 180-81 n. 12 (1986) (holding no due process violation where the prosecution stated: "I wish that I could see [the defendant] sitting here with no face, blown away by a shotgun"). The prosecutor may have made improper statements, but the jury witnessed the evidence and was supplied with jury instructions describing the law. Therefore, they were free to disagree with the prosecutor's conclusions. For example, in summation, concerning Cassano's knowledge of the crime, the government stated: "What Mr. White said to Mr. Cassano is I want you to cash some checks and here's the story. Here's the divorce story." (R. 3171). If this statement was misconduct at all, it was not serious. The prosecutor may have drawn a conclusion about the subtext of the conversation between Cassano and White, *i.e.*, that Cassano knew the divorce story was false. However, the jurors could have simply disregarded the prosecution's view of events and draw their own conclusions.

Finally, the district court's instructions cured any prejudice the statements had on the defense. For example, in

perhaps the clearest illustration of an improper statement in summation, the prosecutor suggested that in order to convict Cassano the jury only needed to find that he knew the money was "dirty." This statement, as the district court found, is a not an accurate portrayal of the law. However, upon objection to that statement the judge reassured the defense by telling them that "[the jurors] have been given instructions [on the law] and they will have the instructions to take into the jury room." (R. 3174) Because this court presumes the jury followed the judge's instructions as to the law they were to apply, *see United States v. McKinney*, 954 F.2d 471, 478 (7th Cir. 1992), we cannot conclude the district court erred in finding this statement by the prosecutor did not deprive the defendant of a fair trial.

As for the prosecutor's other statements, the judge's instruction that "the lawyers' statements [during summation] are not evidence," in conjunction with the court's admonition to the jury about following the instructions was adequate to mitigate any unfairness caused. Therefore, because the comments made by the prosecutor in summation did not deprive the defendant of a fair trial, we hold the trial court did not abuse its discretion in denying Cassano's motion for a mistrial.

### C.  Multiplicity

Next, Cassano alleges, for the first time on appeal, that counts sixteen and seventeen, which deal with structuring, are multiplicitous and should be reversed and the matter remanded for resentencing. Essentially, a claim of multiplicity alleges that separate counts in an indictment charge a single offense. *See United States v. Conley*, 291 F.3d 464, 469 n. 4 (7th Cir. 2002); *United States v. Briscoe*, 896 F.2d 1476, 1522 (7th Cir. 1990) (citing *United States v. Marquardt*, 786 F.2d 771, 778 (7th Cir. 1986)). The danger presented by multiplicitous charges is that the defendant

will be punished more than once for a single crime, offending the Double Jeopardy Clause of the Constitution. *See United States v. Podell*, 869 F.2d 328, 330 (7th Cir. 1989).

Because Cassano failed to raise his multiplicity claim prior to appeal, we review only for plain error. *See United States v. Olano*, 507 U.S. 725, 733 (1993); *Briscoe*, 896 F.2d at 1522. "A plain error is one that results in 'an actual miscarriage of justice.'" *Id.* (quoting *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir. 1988)). To test for multiplicity, a court must "determine[ ] whether each count requires proof of a fact which the other does not." *United States v. Gonzales*, 933 F.2d 417, 424 (7th Cir. 1991) (internal citations omitted). "If one element is required to prove the offense in one count which is not required to prove the offense in the second count, there is no multiplicity." *Conley*, 291 F.3d at 470.

Counts sixteen and seventeen of the indictment allege Cassano, on two separate dates, structured the cashing of CNA checks so as to avoid the filing of a Currency Transaction Report (I.R.S. Form 4789). Cassano cites this court's decision in *United States v. Davenport*, 929 F.2d 1169 (7th Cir. 1991), for the proposition that although there may be separate deposits made, they may all be part and parcel of "one structuring, one violation." *Id.* at 1171. However, the *Davenport* case can be easily distinguished. In *Davenport*, the defendants structured deposits of the proceeds from a *single* transaction, *i.e.*, they were depositing chunks of a $100,000 transaction in increments of less than $10,000 at a time to avoid the reporting requirements. *Id.*

Such is not the case here. The indictment alleges that two separate transactions were structured, on two separate dates. The government alleged that the two transactions, of approximately $12,000 a piece, were split into two checks and cashed on the same day for no other reason than to avoid reporting requirements. Merely because the misap-

propriated funds were derived from the same source does not mean they are part of a single transaction. Such a holding would defy logic as well as common sense. *See id.* (holding that "the structuring itself, and not the individual deposit, is the unit of crime") Therefore, we hold there was no "actual miscarriage of justice" that resulted from Cassano being charged with two counts of structuring on two separate dates and we decline to reverse his conviction on these counts.

### D. *Hearsay Evidence*

The final issue Cassano raises on review concerns alleged hearsay statements made by White during his testimony at trial. Cassano claims the prosecution elicited inadmissable hearsay evidence in its direct examination of White regarding the reluctance of two unidentified individuals to take part in the conspiracy when asked to do so. Specifically, Cassano claims the district court erred in not granting his motion for a new trial, because the following testimony constituted inadmissible hearsay:

> Q: Did you speak with anyone at—well, what, if anything, did you do to prepare for the checks continuing to come before you went to jail?
>
> A: Well, I tried to find somebody who would be able to handle it while I was gone, you know, to cash the checks for me.
>
> Q: How many people did you talk to?
>
> A: I think three.
>
> Q: Did the first two people agree to help?
>
> Mr. Meyer [for defendant Cassano]: Objection, Your Honor, hearsay.

The Court: I'll sustain the objection. You can rephrase that, counsel.

\*\*\*

Q:  Did that first person help you?

Mr. Meyer: Judge, that question calls for a hearsay answer.

The Court: You've already objected to that, counsel. Overruled.

Q:  Did that first person help you?

A:  No.

Q:  Did the second person help you?

A:  No.

Mr. Meyer: Judge, could I have a continuing objection?

The Court: The record will reflect your continuing objection, counsel.

(Tr. 1083-85.)

We review the evidentiary decisions of the district court for an abuse of discretion. *United States v. Bonner*, 302 F.3d 776, 780 (7th Cir. 2002). A hearsay "statement" is defined by the Federal Rules of Evidence as: "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. 801(a). Hearsay, is a statement "other than one made by the declarant while testifying at the trial, or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

First, White's testimony did not contain a "statement" or nonverbal "assertion" of a third-party declarant under Rule 801. The Advisory Committee to the Federal Rules of evidence, in its notes to Rule 801, explains that "the definition of statement is to exclude from the operation of

the hearsay all evidence of conduct, verbal or nonverbal, not intended as an assertion." Fed. R. Evid. 801 advisory committee's note. The testimony recounted above contains nothing which could be reasonably characterized as an assertion. White's testimony merely described the nonassertive conduct of the first two men whom he requested help cashing checks from, which cannot be considered hearsay. *See United States v. Perez*, 658 F.2d 654, 659 n. 4 (9th Cir. 1981) ("Nonassertive conduct is admissible whether it is verbal or nonverbal.").

Also, assuming we did find an assertion was made, the statement would not be one "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). White was describing what he did, and any negative assertion by the men was offered, not to prove the truth of the matter, but to describe the effect on White's conduct and how it was he came to ask Cassano to help in the conspiracy. *See United States v. Linwood*, 142 F.3d 418, 424-25 (7th Cir. 1998) (a statement used to explain why someone reacted as they did upon hearing a statement is admissible for a non-hearsay purpose).

Because White's testimony does not contain a "statement" and was not offered "to prove the truth of the matter asserted," we hold that the district court did not err, let alone abuse its discretion in denying Cassano's motion for a new trial on the grounds that hearsay evidence was admitted.

### E.   *William's Motion for Acquittal*

Like Cassano, Williams claims the district court erred in denying his motion for judgment of acquittal. Williams claims the government failed to prove, beyond a reasonable doubt, criminal intent on his part with respect to the charges of mail fraud, conspiracy to launder monetary instruments, and engaging in monetary transactions with

criminally derived property. We review the denial of a motion for acquittal *de novo. O'Hara*, 301 F.3d at 569. Also, as stated above, the denial of a motion for acquittal on sufficiency of the evidence grounds will be reversed on review "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *Thompson*, 106 F.3d at 799. We hold that Williams has failed to meet this lofty burden.

The evidence presented against Williams at trial was certainly sufficient for a jury to find that Williams knew, or should have know, that he was participating in an unlawful, criminal activity. The evidence established that over two-years time Williams' fictitious company, Fidelity Graphics, received $1.3 million in CNA checks for doing little or no work. The amount of money received for doing little or no work, viewed in isolation, could lead a jury to believe that Williams knew or should have known that he was engaged in a fraudulent and unlawful undertaking. *See Inglese*, 282 F.3d at 537.

Furthermore, Fidelity Graphics only existed on paper and never serviced any clients or served any other purpose other than as a vehicle for laundering the monies derived from CNA checks. In addition, 65% of the funds derived from the CNA checks was immediately turned over to Cross in cash. Finally, Williams used the proceeds from the CNA checks on personal items such as luxury goods and financial investments.

Williams counters by claiming that he believed he was being compensated either for being a minority business owner and for producing invoices. However, trial evidence refutes both of these claims. When asked to do so, Williams could produce no invoices he prepared for CNA. Likewise, CNA had no record of, and could not locate, any invoices allegedly prepared by Williams or Fidelity Graphics. Also, although Fidelity Graphics held itself out to be a certified

minority-owned corporation, it was in fact neither a corporation nor was it certified as minority owned. Therefore, even Williams' defense is predicated on a fraud.

Although primarily circumstantial, the evidence presented at trial was more than sufficient to support a conclusion by the jury that beyond a reasonable doubt Williams was, at a minimum, deliberately ignorant of the underlying fraud taking place at CNA. *See Gracia*, 272 F.3d at 874 ("Circumstantial evidence is sufficient support, and may be the sole support, for a conviction."); *see also Inglese*, 282 F.3d at 537 ("actual knowledge and the deliberate avoidance of knowledge are the same thing"). Thus, we hold the district court did not err in denying Williams' motion for acquittal as a matter of law.

## F.   Cross' and Williams' Motions for Severance

Both Cross and Williams claim they were denied a fair trial due to the trial judge's failure to grant their respective motions to sever. Williams moved for severance prior to trial, claiming Cross would make inculpatory statements about Williams. Cross made his motion during the trial, claiming he was being unfairly prejudiced by Williams' attorney who was acting as a "second prosecutor." Both motions were denied, but were never renewed at the end of evidence.

Williams asserted that co-defendant Cross would offer inculpatory evidence regarding Williams' knowledge of the underlying unlawful origin and nature of the CNA check payments he received. The court denied Williams' pre-trial motion because he had failed to produce any evidence or affidavits supporting his claims regarding Cross' expected testimony. Williams further claims that, during trial, Cross' testimony contradicted his own and, therefore, prejudiced him.

For example, Cross testified that he did not have an arrangement with Williams to split the checks 30-70 with each receiving cash. Cross also claimed he never told Williams that the 70% he received was being paid to subcontractors who were actually performing the mailing work. Indeed, he claimed never to have received any cash from Williams at all. In addition, Cross denied that Fidelity Bindery only did invoicing, but claimed they did "prep" work as well. Cross also testified that he never told Williams that CNA was hiring Williams' company to demonstrate minority participation. Williams claims these contradictions denied him a fair trial and that the district court erred in not granting his motion to sever.

Cross also claims his trial rights were severely prejudiced by not being granted a motion to sever. At trial, Williams' attorney elicited the following testimony from Frank Erion, a CNA investigator, regarding Cross' criminal intent, which was the basis of Cross' motion to sever:

Q: You say [Williams] kept 35 percent [of the amount that Fidelity Graphics was billing CNA], correct?

A: Correct.

Q: And 65 percent was sent back to CNA to cover the printing, et cetera, being performed by other entities?

A: Correct, [Williams] said that.

Q: And the reason that it was being sent back was to cover the costs of these other expenses, correct?

A: Correct.

Q: And Williams told you that Cross told him that he needed to be paid in cash, that CNA needed to be paid in cash, right?

A: Correct.

(Tr. 944.) Counsel for Cross objected on the basis of hearsay, which the court overruled as untimely, at which time Cross moved for severance and a mistrial. However, Williams' counsel told the court he planned to call Williams at trial. The trial judge denied Cross' motions, reasoning Cross would have an opportunity to cross-examine Williams as to the statements made to the investigator, thereby curing any unfair prejudice the testimony may have caused. The court also admonished the jury not to consider the testimony as it related to Cross, but only as to the government's case against Williams.

We review the denial of a motion to sever by a trial judge for abuse of discretion only. *See United States v. McClurge*, 311 F.3d 866, 871 (7th Cir. 2002), "In all but the 'most unusual circumstances,' the risk of prejudice arising from a joint trial is 'outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all.'" *Id.* (citing *United States v. Blassingame*, 197 F.3d 271, 286 (7th Cir. 1999)). However, unless a motion to sever is renewed at the close of the evidence, it is waived. *See United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002). "The timing of the motion is important because the close of evidence is the moment when the district court can fully ascertain whether the joinder of multiple counts was unfairly prejudicial to the defendant's right to a fair trial." *Id.* A waiver of this nature generally precludes appellate review of any kind. *See United States v. Olano*, 507 U.S. 725, 733 (1993). The reason for this is to avoid giving the defense incentive to first try to gain an acquittal and then, post-conviction, getting "another crack at the jury." *Rollins*, 301 F.3d at 518 (quoting *United States v. Taglia*, 922 F.2d 413, 417 (7th Cir. 1991)). However, the failure to renew a motion to sever may be excused if the defendants can "demonstrate that refiling [the motion to sever] would have been . . . futile." *United States v. Caudill*, 915 F.2d 294, 298 (7th Cir. 1990).

However, neither Cross nor Cassano have demonstrated that renewal would have been futile, nor have they given any compelling reason why this court should not hold that their right to appellate review on this issue has been waived. Indeed, the court's ruling on the motion to sever suggests the court was willing to hear the testimony of Williams under the assumption that any prejudice caused to Cross could be cured on cross examination. Also, Cross' testimony was the basis of Williams' pre-trial motion to sever, therefore, if Williams objected to the nature of that testimony, a renewed motion to sever would have been entirely proper. The close of evidence would have been the perfect time for the trial judge to evaluate the prejudicial effect of any of the testimony given at trial to determine whether severance was proper. *See Rollins*, 301 F.3d at 518. Therefore, because the renewal of the motion to sever at the close of evidence would not have been futile, and because the defendants have waived their right to review on this issue, we see no reason to stray from the well-established rule that once "a claim has been waived, there is generally no appellate review." *Rollins*, 301 F.3d at 518.

## III.  CONCLUSION

For the reasons discussed herein, the district court's judgment is

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*