In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2236

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TERRI SAWYER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP-06-126-CR-04-M/F—**Larry J. McKinney**, *Judge.*

ARGUED FEBRUARY 12, 2009—DECIDED MARCH 12, 2009

Before EASTERBROOK, *Chief Judge*, and FLAUM and
MANION, *Circuit Judges*.

FLAUM, *Circuit Judge*. Terri Sawyer was convicted for
participating in a conspiracy to distribute methamphet-
amine. Her appeal primarily rests on the district court's
refusal to instruct the jury on the elements of a duress
defense, although she also raises questions about her
sentence and certain evidentiary rulings as well.

For the following reasons, we affirm the judgment and
sentence of the district court.

## I. Background

In February 2008, at the conclusion of a two-day trial, a federal jury convicted Terri Sawyer of conspiracy to deliver 500 or more grams of a mixture or substance containing methamphetamine. Sawyer presented a very different account of the events leading to that conviction than the government. She claims she was relentlessly threatened by Seferino Rodriguez, one of the government's witnesses at trial, because of a previous drug debt owed by her ex-boyfriend. To pay off this debt, she claims that Rodriguez forced her to find meth buyers. The government's evidence at trial indicated that Sawyer was a willing participant in a meth-dealing operation, and that she purchased meth from Rodriguez and was responsible for introducing various buyers and suppliers.

Seferino Rodriguez offered testimony in support of the government's case. Rodriguez testified that he began dealing meth in January 2005, when Sawyer asked him to sell it to her. He had met Sawyer a few months before, because Rodriguez had sold marijuana to Sawyer's boyfriend Ryan Beauchamp. After Sawyer asked him for meth, Rodriguez met with a man known as Gavacho at a nightclub, and Gavacho agreed to sell him meth. Rodriguez testified that he set up his first sale to Sawyer about a week after this. Continuing for the next six months, Rodriguez sold meth to Sawyer, usually once or twice per week. In late June or early July 2005, Sawyer introduced Rodriguez to a customer of hers, Donald Pruett. Rodriguez testified that when he met "Donnie" (as Rodriguez knew him) they made a deal to buy meth. Shortly

after this sale, Rodriguez went to Texas for his sister's birthday. In his absence, Gavacho sold meth directly to Sawyer. Rodriguez went back to selling meth to Sawyer when he returned to Indiana in September 2005.

Some time after Rodriguez returned to Indiana, Sawyer introduced him to Gregory Vanes. According to his trial testimony, Sawyer introduced Vanes as her partner in meth dealing. For the next few months, until police officers arrested him in February 2006, Rodriguez sold meth to both Sawyer and Vanes. Rodriguez delivered the drugs once or twice per week, in pound quantities. During this time, Sawyer introduced Rodriguez to two other customers, Jason Swearingen and Heather Crowder; as a result of these introductions, Rodriguez sold meth to both of them.

In January 2006, Sawyer and Vanes told Rodriguez that their partnership had ended over a financial dispute. Rodriguez continued selling meth to Sawyer for the next month or so. He was arrested on February 13, 2006, by Indianapolis police officers while in possession of nine ounces of meth. At the time of his arrest, he was on his way to complete a deal with Sawyer.

The government's case included several additional witnesses. Vanes testified that Sawyer introduced him to Rodriguez as a supplier of methamphetamine and that he and Sawyer bought meth from Rodriguez regularly after that meeting; Vanes admitted to personally receiving five or six one-pound shipments. At the same time, Vanes was also buying meth from another source in five or ten pound shipments; he

testified that he would deliver two to five pounds to Sawyer after each delivery from this other source.

Donald Pruett testified that he began buying meth from Sawyer in February 2005, and bought meth from her about once a month for the next six months. Eventually, Pruett learned of Sawyer's suppliers, including "Seferino" (presumably Rodriguez), "Gordo," "Joker," and "Gavacho." Pruett stopped buying from Sawyer when she arranged a drug transaction with her suppliers that she did not show up for; after that, Pruett bought directly from Sawyer's suppliers. Jason Swearingen testified that he met Sawyer in August 2004, and began buying meth from her about a month later. He and his girlfriend, Heather Crowder, bought about one pound of meth per week from Sawyer. Crowder testified that she met Sawyer around the same time as Swearingen, and that Sawyer and Swearingen arranged a meth deal at that first meeting. After that, she and Swearingen regularly bought one-pound quantities of meth; many of these deals took place in Indianapolis, where Crowder was introduced to some of Sawyer's suppliers. The government's case also included a recorded phone call between Sawyer and Crowder that took place after Swearingen had been arrested on drug charges; in that call, Crowder asked "when do we go back to work," meaning, she testified, when they could go back to selling meth.

The government also presented the testimony of Special Agent Michael Davis of the Drug Enforcement Administration. Davis testified that he executed the search warrant on Sawyer's home in Richmond, Indiana in November 2006.

In that search, law enforcement officers recovered a small amount of meth, approximately $11,746 in currency, and weights for a scale.

Sawyer presented a very different version of events. She testified that she began dating Ryan Beauchamp in 2004; eventually, both of them began to use methamphetamine. Sawyer testified that Beauchamp was friends with Rodriguez, and that the two of them dealt marijuana and cocaine together. This business relationship soured when Beauchamp ripped Rodriguez off in a drug deal, however. (Rodriguez, when asked about this deal during his testimony at trial, said that Beauchamp had been assaulted and robbed after Rodriguez fronted him fifteen pounds of marijuana; he testified that he did not try to collect on this debt.) Sawyer testified, however, that Rodriguez began threatening Beauchamp after that deal. First, Rodriguez showed up at Sawyer and Beauchamp's house with several other men and threatened Beauchamp. After that night, Sawyer threw Beauchamp out of their shared house.

After that confrontation, Rodriguez evidently lost contact with Beauchamp and instead began harassing Sawyer about the debt. At one point he and several other men showed up at Sawyer's house and demanded that she go with them to Hoosier Marine to get Beauchamp's boat released as payment. Rodriguez acknowledged that he made this trip, and the manager of Hoosier Marine testified that he remembered Sawyer looking scared during their conversation.

Looking for other ways to pay off the debt, Sawyer testified that she then began introducing Rodriguez

to potential customers. She claims to have acted as a middleman in transactions between Rodriguez and the government's other witnesses at trial. She testified that she was present when others bought meth from Rodriguez, but never participated in re-selling.

Sawyer never contacted the police because, she claimed, Rodriguez was a member of the Mexican Mafia and she was afraid he would find out if she did. She testified that the debt that Beauchamp owed Rodriguez (and that as a result she owed Rodriguez) was between $25,000 and $30,000. Rodriguez would call her, she claimed at trial, "daily," by "coming down constantly, saying they would be—he would tell me they would circle the house the night before and just—I was an emotional wreck." With respect to the nature of the contact, Sawyer testified that, "he would be on to me, like, tell them to move the dope faster and get people up there; and, you know, 'These guys are, you know, getting mad,' just same stuff every day."

On cross-examination she admitted that she did not have any conversations about the running balance of that debt or how much it diminished based on the number of introductions that she made, until October 2005 when Rodriguez had reduced the debt by $10,000. She also testified that she moved from Cloverdale, Indiana, to Richmond, Indiana in December 2005, in order to get away from Rodriguez. The threatening encounters with Rodriguez ended after she moved, although Sawyer testified that he would still contact her by phone.

During an instruction conference at the trial, Sawyer tendered an instruction on the affirmative defense of

duress. The government objected on the grounds that Sawyer had not met the burden of production for that defense because she had not established that she faced an immediate threat of death or bodily injury and did not have a reasonable opportunity to escape the threatened harm. The district court agreed with the government and declined to issue the instruction.

The jury convicted Sawyer of conspiracy to distribute methamphetamine at the close of the trial. On May 9, 2008, Sawyer was sentenced to 260 months in prison. This appeal followed.

## II. Discussion

Sawyer raises three issues in this appeal. First, she argues that the district court erred by not tendering her proffered instruction on duress to the jury; second, she argues that the district court erred by excluding certain evidence from her trial; third, she argues that the district court imposed an unreasonable sentence. We take each claim in turn.

### A. Duress instruction

This court reviews de novo a district court's decision not to give a defense instruction. *United States v. Brack*, 188 F.3d 748 (7th Cir. 1999); *see also United States v. Prude*, 489 F.3d 873, 882 (7th Cir. 2007) ("We review a district court's refusal to give a theory of defense instruction de novo."). A defendant is entitled to offer an

instruction on an affirmative defense or a theory of defense if: (1) the defendant's proffered instruction is a correct statement of the law; (2) the theory of defense is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include the instruction would deny the defendant a fair trial. *United States v. Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005). A defendant is entitled to have a jury consider a proffered defense so long as that defense has a foundation in the evidence, "however tenuous" that foundation may be. *United States v. Given*, 164 F.3d 389, 394 (7th Cir. 1999).

Sawyer's claim centers around the affirmative defense of duress. The duress defense has its roots in common law, and excuses criminal conduct, even though the defendant engages in it with the requisite *mens rea*, because the defendant nevertheless acted under a threat of a greater immediate harm that could only be avoided by committing the crime charged. Under the law of this circuit, a defendant attempting to present a defense of duress or coercion must show: (1) she reasonably feared immediate death or serious bodily harm unless she committed the offense; and (2) there was no reasonable opportunity to refuse to commit the offense and avoid the threatened injury. *United States v. Jocic*, 207 F.3d 889, 892 (7th Cir. 2000). If the defendant had a reasonable alternative to violating the law, then the defense of duress will not lie. *Id*. A defendant's fear of death or serious bodily injury is generally insufficient. Rather, "[t]here must be evidence that the threatened harm was present, immediate, or impending." *United States v. Tanner*, 941 F.2d 574, 587 (7th Cir. 1991). Further, Supreme Court precedent also

suggests that when a defendant presenting a duress defense committed an ongoing crime (such as, in this case, conspiracy) that defendant must have ceased committing the crime as soon as the claimed duress lost its coercive force. *See United States v. Bailey*, 444 U.S. 394, 412-13 (1980) (holding that an escapee from custody must present evidence that he surrendered to authorities as soon as the coercive force ceased when he claimed his escape occurred under duress).

The district court declined to issue the jury instruction in this case because it did not find a sufficient evidentiary basis for it. The court first noted that, "I don't think there's evidence that the threat was immediate. . . . The cases that give these instructions are cases in which there's someone right there on the spot enforcing the person's activities. This isn't—we don't have that." With respect to the second portion of the defense, the district court found that she had a reasonable opportunity to refuse to commit the offense, noting that "there was so much time available for her to have reached out to law enforcement and she chose not to."

One sentence of the district court's opinion complicates our review, however. The district court, when discussing the evidence presented, found that "[t]here's just not enough evidence here to meet the burden—preponderance on her burden to show that she engaged in conduct because she reasonably feared that immediate serious bodily harm or death would be inflicted upon her and that she had no reasonable opportunity to avoid injury." Sawyer argues on appeal that the district court's

reference to "preponderance" was erroneous and applied the wrong evidentiary standard to the instruction.

Sawyer suggests that the district court was improperly applying the Supreme Court's decision in *Dixon v. United States*, 548 U.S. 1 (2006). That case held that the defendant bears the burden of demonstrating the elements of a duress defense by a preponderance of the evidence. The holding of *Dixon* pertains to the ultimate burden of proof on the issue at trial and not the initial showing that a defendant must make before the court will instruct the jury on the defense, however. On an initial showing, a defendant need show only a foundation for the elements of the defense in the evidence, not a preponderance of the evidence supporting the defense.

Sawyer argues that this legal error merits reversal, as the district court used the wrong legal standard when rejecting the jury instruction. The government argues that Sawyer's claim is insufficient as a matter of law. Her presentation did not include any evidence of an "immediate" threat. Instead, her duress case relies on unspecific threats of violence at a future time. The government also argues that this extended time frame prohibits Sawyer from producing evidence that she had no reasonable opportunity to refuse to commit the offense. Over the course of a year, the government argues, Sawyer would have had ample opportunity to report Rodriguez to the police, and could have done so anonymously if she feared for her safety.

With respect to Sawyer's argument on appeal, the district court's use of the word "preponderance" in its

ruling on the jury instruction does raise some question about what evidentiary standard the court applied. The remainder of the ruling, however, indicates that the court simply found no evidentiary basis for the proposed instruction under the correct standard. The scenario that Sawyer presented at trial was a far cry from the kind to which the duress defense applies. The court noted that she had not alleged that she ever acted under an immediate threat (such as someone monitoring or enforcing her behavior) nor that, during the course of a year, she did not have a reasonable opportunity to escape the threatening conduct.

As the remainder of our discussion indicates, the district court committed harmless error even if it applied the wrong evidentiary standard, as Sawyer simply did not establish a foundation for the defense. This circuit has long held that the threat giving rise to a duress defense must have been "present, immediate, or impending." *Tanner*, 941 F.2d at 587. Sawyer does not allege an immediate threat; her brief alleges that Rodriguez was affiliated with the Mexican Mafia and was capable of harming Sawyer and her son, but in her testimony she did not claim that Seferino Rodriguez or anyone else was present at all times when Sawyer was involved with the meth ring, forcing her to act under constant compulsion. Even taking her testimony at face value, it recounts Rodriguez's allusions to future violence if Sawyer refused to pay off Beauchamp's drug debt. We have previously noted in this context that, "'future' or 'later' and 'imminent' are opposites." *United States v. Tokash*, 282 F.3d 962, 970 (7th Cir. 2002). Whether

or not it was reasonable, Sawyer's fear of future violence if she did not cooperate with Rodriguez does not entitle her to a duress defense. *See United States v. Sahakian*, 453 F.3d 905, 910 (7th Cir. 2006) (finding that "Sahakian's fear that he *might* be assaulted at some future point by some *unidentified* inmate" was insufficient for a duress defense).

Additionally, Sawyer did not present evidence that she could have avoided this threat only by agreeing to help sell drugs, with no reasonable opportunity to seek protection from law enforcement. Her case is actually very similar to the circumstances in *Tanner*. In that case, a prison inmate was charged with possession of cocaine with intent to distribute after a package he attempted to smuggle into the prison was intercepted. *Tanner*, 941 F.2d at 576. A witness at trial testified that the defendant only smuggled the package in because another inmate had threatened his life if he did not help. *Id.* at 587. We held that the defendant had not demonstrated that no other reasonable alternative was available, since the defendant could have sought protective custody or notified prison guards. *Id.* In this case, Sawyer did not present evidence that she never had the chance to contact the police in order to report Rodriguez's threats. Since she is alleging ongoing threats over the course of a year, it would be virtually impossible for her to present such evidence. She does allege that she was afraid of Rodriguez's Mexican Mafia connections and believed he would find out if she reported him to the police. Outside of this assertion, however, she presented no evidence that Rodriguez is actually a member of the Mexican

Mafia, or that the group has moles inside the various police forces in Indiana such that it would have been unreasonable for her to seek their protection. Finally, Sawyer failed to meet *Bailey*'s requirement that she cease committing the crime as soon as the threats against her lost their coercive force. Sawyer testified that her threatening run-ins with Rodriguez ended when she moved to Richmond, but she continued to sell drugs after the threat had passed, and continued to sell during the months that Rodriguez was in Texas in the summer of 2005.

We also note that the threat of future violence, often implied and sometimes express, is frequently the currency of drug trafficking operations, and allowing a duress defense in circumstances such as this where the defendant has not shown the requisite elements would flood drug prosecutions with jury instructions in cases where they are unwarranted. We thus affirm the district court's decision not to offer the instruction in this case.

## B. Exclusion of evidence

Sawyer next argues that the district court erred by excluding testimony from two witnesses. We review those evidentiary rulings only for an abuse of discretion. *United States v. Rollins*, 544 F.3d 820, 830 (7th Cir. 2008). Moreover, harmless error analysis also applies to a district court's evidentiary rulings. *United States v. Zapata*, 871 F.2d 616, 622 (7th Cir. 1989).

Sawyer first challenges the district court's decision not to admit the testimony of Shaun Clark, who was in prison for various drug trafficking offenses. Clark's testimony would have been hearsay offered through Michael Davis, the DEA agent who testified during the government's case. Davis would have testified that Clark purchased methamphetamine from various drug dealers (including Vanes) but when offering testimony to government agents about whom he had purchased from, did not name Sawyer as one of them. The government objected to the evidence on relevance grounds and hearsay. Sawyer contends that the evidence would be relevant to a line from the government's opening statement, claiming that Sawyer was a "principal" distributor of methamphetamine in her part of Indiana. Sawyer contends that the absence of her name from Clark's hearsay statement makes it more likely that she was just a middleman or a broker rather than a drug distributor, and is relevant for that reason. Sawyer also contends that the evidence was not hearsay because it was not offered for the truth of the matter asserted (to show that Clark could have bought meth from the various sources he named) but to show that people investigated the meth market and discovered that Sawyer was not named as someone from whom meth could be purchased.

Sawyer attempts to rely on *United States v. Blandina*, 895 F.2d 293, 299 (7th Cir. 1989), in support of the statement's admissibility. In *Blandina*, a defendant charged with tax evasion claimed that he was not understating his income because much of his accumulated wealth resulted from selling rare coins left to him by his grandfather. The

government presented rebuttal testimony from an IRS agent who refuted this defense. He claimed to have interviewed sixty-one rare coin dealers in two states, none of whom had ever transacted with the defendant. When the defendant challenged that testimony as hearsay on appeal, this court held that the testimony was not offered for the truth of the matter asserted, but merely to show that the agent's testimony was the result of a thorough investigation. *Id.* at 300.

Sawyer is attempting to make such an indirect evidentiary point that it is extremely difficult to conclude whether or not she is really offering the statement for the truth of the matter asserted. However, it appears that Clark's testimony was either hearsay or it was irrelevant, and it was probably both. As it is presented to this court, the testimony is that Clark purchased from the major drug distributors in Indiana, and did not name Sawyer as one of them. If that is the evidence that Sawyer wanted to present, then the testimony is hearsay because it depends on the truth of the matter asserted, namely Clark's knowledge of the drug market. If it is not the testimony of someone who knows all the drug distributors, but merely the testimony of someone who bought meth but did not buy it from Sawyer, then it is irrelevant. It does not contradict any of the trial testimony and makes it no less likely that Sawyer sold or bought meth from the government's witnesses. Apparently Sawyer wanted to use the testimony to rebut the government's charge in its opening statement that she was a "principal" distributor. That Clark's testimony may have showed that Sawyer was not a "principal" does not

make the evidence relevant. The indictment in this case did not charge her with being a "principal" anything, only being a participant in a conspiracy. The government bore no burden of proof on her status in the conspiracy at trial. *See* Fed. R. Evid. 401 (relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). At any rate, we are satisfied that the inference Sawyer was asking the jury to draw from this hearsay testimony was so indirect and insubstantial, especially compared to the testimony of her coconspirators at trial, that the district court's decision to exclude it passes harmless error review as well.

The second piece of testimony that Sawyer wanted to offer was testimony from witnesses to an altercation between Ryan Beauchamp and Seferino Rodriguez and another group of people at a strip club in Indianapolis. The witnesses would have testified that when friction developed between the two groups Rodriguez placed a phone call and several other friends of Rodriguez arrived at the bar. Sawyer argued that this evidence was relevant to establish the credibility of the threat she faced from Rodriguez, as she heard about the incident and claims it contributed to her fear.

The government argues that the evidence is irrelevant. Relevance, of course, is determined by whether the evidence makes any fact relevant to a determination of the action more or less likely. We agree with the district court that whether or not Rodriguez was able to get on

the phone and call for help in intimidating other strip club patrons does not make it any more or less likely that he threatened Sawyer. At best, this evidence shows that Rodriguez was capable of summoning people if he wanted to make a threat; it does not show that he ever threatened Sawyer nor that he ever threatened her in the same way that he threatened this anonymous group of people in the nightclub. It certainly does not show an immediate threat supporting Sawyer's duress defense.

### C. Reasonableness of Sawyer's sentence

Sawyer's final argument is that the district court imposed an unreasonable sentence of 260 months. We review a district court's application of the sentencing guidelines de novo and its factual findings for clear error. *United States v. Hollins*, 498 F.3d 622, 629 (7th Cir. 2006). Ultimately, our review is concerned with the reasonableness of the defendant's sentence, based on the calculation of the guidelines and the discretionary factors enumerated in 18 U.S.C. § 3553(a). A properly calculated within-guidelines sentence is entitled to a non-binding presumption of reasonableness on appeal. *Rita v. United States*, 127 S. Ct. 2456, 2462 (2007).

Sawyer concedes that her 260-month sentence was properly calculated and was within the range specified by the relevant sentencing guideline. She argues, however, that the sentence was "likely enhanced from a sentence at or near the bottom of the guidelines of 235 months due to the court's finding that Sawyer did not tell the truth during her testimony." The supposedly untruthful testi-

mony related to the source of money found in her home (Sawyer claimed it was from a deceased relative), her reasons for joining the conspiracy (she claimed she was under duress) and her overall role (she claims she only made introductions). Sawyer argues that this was improper because the district court did not find at the jury instructions conference that Sawyer's testimony on the duress defense was false, and declined to impose a two-level enhancement to her offense level based on obstruction of justice. Her argument is that if the district court did not bar her proffered jury instruction because of false testimony or impose an enhancement for obstruction of justice, it is not entitled to find that Sawyer was untruthful in her testimony.

The government argues that the district court's determination that Sawyer did not tell the truth in her testimony simply represented the district court's decision to credit the testimony of Sawyer's accomplices—who presented her as a central figure in the conspiracy—rather than Sawyer's testimony. Such a decision is within the district court's discretion and does not make the sentence unreasonable.

Sawyer's sentence is harsh, considering that she has no previous criminal record: 260 months works out to nearly twenty-two years in prison. That the law imposes such a severe sentence on a first-time offender whose circumstances present a case for leniency is a reflection of the severe penalties that Congress has legislated for drug crimes, and a sentencing regime that uses the weight of drugs in the entire conspiracy as a baseline for the sentencing of each member of that conspiracy. The

sentence was within the relevant guideline range of 235 to 293 months, however. In deciding not to depart from the guidelines range, the district court cited, among other § 3553(a) factors, the need to deter methamphetamine dealers and the serious nature of trafficking meth. The district court also found that a sentence in the middle of the applicable guideline range was warranted because of Sawyer's "failure to accept responsibility, and go[ing] so far as to tell the jury things that weren't true . . . ."

While it is true that the district court did not find that Sawyer obstructed justice through her testimony, the district court was entitled to find that she had misled the jury, minimized her own role in the conspiracy, or otherwise failed to accept responsibility. Our review of this factual predicate is limited to clear error, and we find none in this case. The district court's findings are consistent with the jury verdict—they found Sawyer guilty, and their verdict is incompatible with Sawyer's testimony that she was a marginal player in the overall conspiracy. The district court was thus entitled to find that Sawyer had failed to accept responsibility for her crimes, and that this in tandem with other factors required a sentence of 260 months.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the judgment and sentence of the district court.