In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 19-2526 & 19-2937

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANGELICA GUZMAN-CORDOBA
and JOEL ALVARADO-SANTIAGO,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 17-cr-00165 — **Tanya Walton Pratt**, *Judge.*

———————————

ARGUED DECEMBER 7, 2020 — DECIDED FEBRUARY 12, 2021

———————————

Before SYKES, *Chief Judge*, and BRENNAN and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Between 2016 and 2017, Angelica Guzman-Cordoba and Joel Alvarado-Santiago participated in an extensive drug trafficking organization operating out of Indianapolis and Chicago. Nine defendants were ultimately indicted as part of a federal investigation into the organization's activities. This consolidated appeal concerns just two of those

defendants: Guzman-Cordoba worked as a drug courier, drug seller, and stash house guard for the organization while Alvarado-Santiago, known as "el catero" or "el kartero" ("the mailman"), laundered the drug proceeds by wiring large sums from the grocery store that he managed in Indianapolis to California and Mexico.

In April 2019, a jury convicted Guzman-Cordoba of conspiracy to distribute and possession with intent to distribute controlled substances and distribution of methamphetamine. The jury also convicted Alvarado-Santiago of conspiracy to launder money. At trial, Guzman-Cordoba presented a duress defense, in which she asserted that she had been forced to join the drug trafficking organization through violence and threats of violence to herself and her family. Alvarado-Santiago defended himself on the grounds that he did not know that the money he had sent to California and Mexico was drug money. He claimed he was just an unknowing and innocent conduit for the funds.

On appeal, Guzman-Cordoba and Alvarado-Santiago argue that the district court made several errors during trial. First, Guzman-Cordoba maintains that the district court erred in limiting the evidence she attempted to introduce regarding her duress defense and also erred in instructing the jury on that defense. Guzman-Cordoba further contends that the district court erred in ordering her to forfeit roughly $10,000 in cash that was found at one of the organization's stash houses. For his part, Alvarado-Santiago insists that the district court erred in only admitting a portion of his post-arrest statement and further erred in admitting a statement by Guzman-Cordoba without limiting the jury's ability to consider that evidence against him. Finally, he claims the district court erred

in giving the jury an instruction on deliberate avoidance of knowledge, also known as the "ostrich instruction."

Finding no reversible error as to either Guzman-Cordoba or Alvarado-Santiago, we affirm their convictions and sentences.

## I. Background

This case is about Guzman-Cordoba and Alvarado-Santiago's participation in a large-scale drug trafficking organization ("DTO") operating out of Indianapolis. Co-conspirators Ricardo Ochoa-Beltran and Miguel Lara-Leon led the organization and were also indicted for their crimes.[1] At their direction, several co-conspirators distributed methamphetamine, heroin, cocaine, and marijuana and sent the proceeds to California and Mexico. The operation included several stash houses in the Indianapolis area.

Cesar Salgado, another co-conspirator and Guzman-Cordoba's boyfriend, brought her into the organization. Over time, Guzman-Cordoba began to sell drugs directly on behalf of the DTO, guard an Indianapolis stash house, and carry drugs and money between Indianapolis and Chicago. During the investigation of the DTO, Guzman-Cordoba sold drugs to confidential informants and to undercover Drug Enforcement

---

[1] The district court planned to try Ochoa-Beltran, Lara-Leon, Guzman-Cordoba, and Alvarado-Santiago together, in one multidefendant trial. However, on the eve of trial, Ochoa-Beltran and Lara-Leon pled guilty. The district court accepted their guilty pleas and sentenced them accordingly. They also appealed their convictions and sentences, but their counsel informs us through *Anders* briefs that there are no non-frivolous issues for appeal. *See* Nos. 19-2979 and 19-3191. We will address their appeals by separate order.

Administration agents in controlled-buy transactions. Guzman-Cordoba was charged with conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 and with distributing methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Alvarado-Santiago was not charged as a co-conspirator in the DTO, but was instead charged with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956. As the manager of his family's grocery store, Alvarado-Santiago laundered the drug proceeds through the grocery store's wire transfer service, offered through InterCambio Express. Over the course of two years, his store funneled hundreds of thousands of dollars in drug trafficking proceeds out of Indianapolis.

Alvarado-Santiago employed several strategies to avoid suspicion or detection by InterCambio Express or the authorities. Although members of the DTO might drop off upwards of $10,000 in cash to transfer on a particular day, Alvarado-Santiago broke the funds up into smaller amounts to avoid triggering additional review by InterCambio Express. In addition, he routinely notified his co-conspirators if the system flagged destination names or addresses as suspicious. He provided a receipt from each transaction to a member of the DTO (often Salgado), but those receipts never contained a customer's signature. Salgado or another co-conspirator paid Alvarado-Santiago $400 for each $10,000 drop that he successfully wired.

At trial, the government introduced evidence of the conspiracy through the testimony of a confidential informant, several law enforcement officers, and Salgado, who pled guilty and cooperated with the government. Through these

witnesses, the government introduced evidence regarding
how the DTO shipped drugs through the mail, the receipts of
wire transfers from Alvarado-Santiago's grocery store, a
ledger kept by Salgado of those wire transfers, cell phones
used by the DTO, text messages between co-conspirators
from those phones, videos and pictures from some of the con-
trolled-buy transactions, and the fruits of a search warrant
that law enforcement executed at one of the stash houses that
Guzman-Cordoba guarded, including drugs (worth over
$100,000), firearms, scales and other tools of the drug trade,
and cash.

Guzman-Cordoba proffered a duress defense, which the
district court permitted her to present to the jury.[2] She took
the stand in her own defense and testified that she had acted
under duress throughout the duration of her involvement
with the DTO. She had fallen under the organization's control
through Salgado—her boyfriend—who ultimately cooper-
ated with the government and testified against her. She feared
for her life and those of her children, and members of the con-
spiracy had made real and immediate threats against her. At
times, she was not permitted to see her children, including a

---

[2] The duress defense requires proof that "(1) [the defendant] reasonably
feared immediate death or serious bodily harm unless she committed the
offense; and (2) there was no reasonable opportunity to refuse to commit
the offense and avoid the threatened injury." *United States v. Sawyer*, 558
F.3d 705, 711 (7th Cir. 2009) (citing *United States v. Jocic*, 207 F.3d 889, 892
(7th Cir. 2000)). "A defense of duress or coercion requires evidence of pre-
sent, immediate, or impending violence. … [P]otential future violence, …
is an insufficient evidentiary foundation for a duress defense." *United
States v. McDowell*, 687 F.3d 904, 911–12 (7th Cir. 2012) (internal citations
omitted).

young baby, and she believed that her babysitter was under the control of the DTO. She testified in graphic detail to a beating that she received at the hands of a DTO member. According to Guzman-Cordoba, the violence of the DTO was "ever present" and she lived in constant fear for herself and her children. The jury heard further evidence through Salgado of other beatings experienced by non-compliant members of the DTO, including one incident in which Ochoa-Beltran, the leader of the organization, forcibly extracted another man's teeth while at the stash house. Guzman-Cordoba was aware of the teeth-pulling incident and understood this conduct as part of Ochoa-Beltran's efforts to manipulate and control his foot soldiers.

Alvarado-Santiago defended himself by attacking the government's contention that he was aware that he was laundering drug money. He also testified in his defense. He denied that he was the individual referred to as "kartero" and denied knowing that he was laundering drug money. He instead testified that he had written down some of the names he had been asked to wire money to in order to audit, or investigate, what he thought might be suspicious transactions.

Despite these defenses, the jury convicted both Guzman-Cordoba and Alvarado-Santiago of all charges.

## II. Guzman-Cordoba's Appeal

On appeal, Guzman-Cordoba makes three arguments. First, she argues that the district court improperly limited the evidence of her duress defense. Second, she argues that the district court erred when instructing the jury regarding her duress defense. Based on these objections, Guzman-Cordoba contends that she is entitled to a new trial. Third, she asks this

Court to vacate the district court's forfeiture order, because
the district court failed to comply with Federal Rule of Crim-
inal Procedure 32.2, which governs criminal forfeiture.

## A. Evidence of Other Deaths

Guzman-Cordoba first argues that the district court
abused its discretion in barring evidence of two deaths that
she argued were relevant to her duress defense. The district
court allowed Guzman-Cordoba to present a duress defense,[3]
and instructed the jury accordingly, but the court limited the
supporting evidence on relevance grounds. Specifically, the
court did not permit her counsel to cross examine the cooper-
ating witness, Salgado, about the death of another DTO mem-
ber, "Pac-Man." The district court also prohibited counsel
from eliciting testimony from Guzman-Cordoba about the

---

[3] We have been reluctant to recognize the duress defense in prior cases
bearing some similarity to this one. "[W]e are dubious of the defense [of
duress] in circumstances where the defendant engaged in numerous drug
transactions over an extended period of time, accepted the proceeds from
the drug sales, and made no effort to contact authorities or permanently
flee the area." *United States v. McGee*, 408 F.3d 966, 983 (7th Cir. 2005) (cit-
ing *United States v. Bailey*, 444 U.S. 394, 410 (1980)).

> We also note that the threat of future violence, often implied and
> sometimes express, is frequently the currency of drug trafficking
> operations, and allowing a duress defense in circumstances such
> as this where the defendant has not shown the requisite elements
> would flood drug prosecutions with jury instructions in cases
> where they are unwarranted.

*Sawyer*, 558 F.3d at 713. Because the parties have not raised this issue on
appeal, the Court need not take a position on whether the duress defense
was proper under these circumstances.

death of her father, whom she believed the DTO had murdered in Guatemala for her non-compliance with DTO orders.

We review properly preserved objections to a district court's evidentiary decisions for an abuse of discretion. *United States v. Washington*, 962 F.3d 901, 905 (7th Cir. 2020). "Abuse of discretion is, of course, a highly deferential standard. We give special deference to evidentiary rulings[.]" *United States v. Groce*, 891 F.3d 260, 268 (7th Cir. 2018). A trial court abuses its discretion only when "no reasonable person could take the view adopted by the trial court." *United States v. Cash*, 394 F.3d 560, 564 (7th Cir. 2005).

Here, the district court reasoned that the two deaths were irrelevant to Guzman-Cordoba's duress defense. We agree. Regarding Pac-Man, Guzman-Cordoba failed to identify any evidence that she knew Pac-Man, knew of his death, or believed that the DTO had a hand in his death. Indeed, even Salgado was unaware of who specifically killed Pac-Man. Given this complete lack of connection to Guzman-Cordoba, Pac-Man's death is not relevant to the question of whether she "reasonably feared immediate death or serious bodily harm" at the DTO's direction. *Sawyer*, 558 F.3d at 711. At oral argument, counsel argued that the district court did not allow Guzman-Cordoba to develop the record on whether she had any direct knowledge of Pac-Man's demise. It is counsel's responsibility to develop the necessary record, however, not the court's, and appellate counsel was unable to point to anywhere in the record where trial counsel requested the opportunity to develop the record on this question or where the district court denied counsel the opportunity to do so.

Regarding Guzman-Cordoba's father, he died *after* she had been arrested, so the fact of his death, and even her

suspicions that the DTO murdered him to punish her, could not have impacted her conduct while she was engaged in the conspiracy. Furthermore, she did not proffer any evidence beyond her own hunch to support her contention that the DTO murdered her father.

We have repeatedly cautioned that the duress defense is limited to circumstances involving threats of immediate or impending death or serious bodily harm. *See Sawyer*, 558 F.3d at 711 (emphasizing that the duress defense requires a showing that the defendant "acted under a threat of a greater immediate harm" and that "fear of death or serious bodily injury is generally insufficient"); *United States v. Fiore*, 178 F.3d 917, 923 (7th Cir. 1999) (emphasizing the need for an *immediate* threat of death or serious bodily injury such that general threats were insufficient). "Fear, by itself, will not legally justify the commission of the criminal act. There must be evidence that the threatened harm was present, immediate, or impending." *United States v. Tanner*, 941 F.2d 574, 587 (7th Cir. 1991). Given the restricted reach of the duress defense, the district court did not abuse its discretion in limiting Guzman-Cordoba's evidence to acts or threats of violence of which she was aware while committing crimes on behalf of the DTO.

In resisting this conclusion, Guzman-Cordoba points to a section of *Sawyer* explaining that in the context of an ongoing crime, like a conspiracy, a defendant claiming duress must have "ceased committing the crime as soon as the claimed duress lost its coercive force." *Sawyer*, 558 F.3d at 711. In other words, once the duress ends, so must the criminal behavior, or else the defendant loses the defense. Guzman-Cordoba mischaracterizes *Sawyer* by arguing that since the duress did not end with her arrest (because she believed that the DTO

murdered her father to punish her for being arrested), her
post-arrest experience is relevant to proving her defense. We
reject this argument. The principle that the illegal acts must
cease as soon as the duress ceases does not mean that coercive
acts that took place after her arrest are relevant to determining
whether Guzman-Cordoba felt coerced *when she committed the
illegal acts*. This is not to say that post-arrest conduct by a crim-
inal enterprise will never be relevant to a duress defense by
one of its members. But in this case, Guzman-Cordoba did not
sufficiently connect her father's death with any reasonable
fear of imminent and serious bodily harm while she engaged
in criminal conduct.

Guzman-Cordoba further contends that excluding the ev-
idence of her father's death left a conceptual void in her story.
She points to her conviction as evidence that the jury did not
understand her narrative. But a conviction does not mean that
the jury failed to understand her defense. It just rejected it.
Indeed, the district court's limitation on Guzman-Cordoba's
duress defense did not deprive her of her ability to present
the defense. To the contrary, the trial transcript contains evi-
dence that the organization recruited Guzman-Cordoba
through Salgado, that other co-conspirators abused and beat
her, and that she was terrified to leave the organization. The
district court gave Guzman-Cordoba wide latitude to argue
her defense and to testify regarding the violence she experi-
enced at the hands of various DTO members. In her opening
statement, defense counsel detailed how Guzman-Cordoba
was beaten by members of the conspiracy. For example, she
explained that two men beat her "until she was bloody." She
was "naked, lying bleeding, and crying on the floor. … [And]
at the time, [she] was 21 years old, had just had a baby, and
she [was] on the floor sobbing." Guzman-Cordoba then

testified in detail to the beating she received. She described that she was beaten by a man twice her size, that the basement floor was covered in blood, and that the beating lasted from 9 p.m. until 3 a.m. She further testified that she thought she "was going to die at that time." She made clear that she could not say no to the drug traffickers' requests, because she lived in fear that members of the DTO would hurt her. She "was afraid they would beat [her] up or … shoot [her] in the head." In addition, she was permitted to cross-examine Salgado about the violence against other members that she was aware of prior to her arrest. In sum, the jury had a detailed picture of the terror and violence that Guzman-Cordoba claimed she experienced; the fact that the jury did not credit her story does not equate to a conceptual void in its telling.

In light of the facts of this case and Guzman-Cordoba's inability to connect either death with any reasonable fear of imminent and serious bodily harm, the district court did not abuse its discretion in disallowing this evidence.

## B. Duress Instruction

Guzman-Cordoba next argues that the district court erred in its duress instruction. The district court provided the Seventh Circuit pattern jury instruction to the jury, which stated:

> To establish that she was coerced, Defendant Angelica Naomi Guzman-Cordoba must prove that both of the following things are more likely true than not true:
>
> 1. She reasonably feared that members of the drug trafficking organization would immediately kill or seriously injure her if she did not commit the offense; and
>
> 2. She had no reasonable opportunity to refuse to commit the offense and avoid the threatened harm.

Guzman-Cordoba argues this instruction was erroneous because it failed to indicate that the threatened injury could be to her *or her family*.

At the jury instruction conference, the government objected to Guzman-Cordoba's request for the duress instruction. The district court overruled the government's "strenuous objection" and instructed the government that it would "have to convince this jury beyond a reasonable doubt that she was not under duress." Guzman-Cordoba's counsel requested the Seventh Circuit's pattern instruction, which includes a bracketed option of instructing the jury on threats of harm to the defendant *or* "specified third persons." The record is not clear whether counsel requested that the jury instruction indicate that the threatened harm could be to both the defendant *and* third persons. Even if she did, defense counsel did not raise an objection to the court's chosen phrasing of the defense, which referred only to harm to the Defendant, at the conference. On the following trial day, the district court again confirmed with the parties that all objections had been made and that the parties otherwise agreed to the instructions. The court specifically asked Guzman-Cordoba's counsel if she had any other objections, to which counsel responded, "No, Your Honor. I approve them."

Because Guzman-Cordoba's counsel approved the jury instructions, she has waived her argument that the duress instruction was incomplete. *See, e.g.*, *United States v. Natale*, 719 F.3d 719, 729 (7th Cir. 2013) ("[A] defendant's affirmative approval of a proposed instruction results in waiver[.]") (citing *United States v. Courtright*, 632 F.3d 363, 371 (7th Cir. 2011)). "[W]aiver extinguishes all appellate review of an issue." *United States v. Turner*, 651 F.3d 743, 747 (7th Cir. 2011).

## C. Forfeiture

Finally, as part of Guzman-Cordoba's sentence, the district court ordered forfeiture of a small arsenal of revolvers, pistols, handguns, and rifles found at the stash house, as well as $9,795 that was found with the weapons, consistent with the superseding indictment, which provided for the forfeiture of all property derived from the proceeds of the crime. Guzman-Cordoba argues that the district court violated Federal Rule of Criminal Procedure 32.2, which sets forth the procedural requirements of criminal forfeiture, by failing to enter a preliminary order of forfeiture and by failing to require the jury to find a nexus between the cash and Guzman-Cordoba's crimes. Guzman-Cordoba does not contest the forfeiture of the weapons; she only contests the forfeiture of the cash.

Rule 32.2 sets forth several important procedural requirements for forfeiture in a criminal proceeding. As relevant to this appeal, subsection (b)(2) of the Rule provides that "[i]f the court finds that property is subject to forfeiture, it *must* promptly enter a preliminary order of forfeiture." *Id.* at 32.2(b)(2) (emphasis added). This preliminary forfeiture order "authorizes the Attorney General … to seize the specific property subject to forfeiture." *Id.* at 32.2(b)(3). The purpose of this preliminary order is to give the defendant notice of the property subject to forfeiture and to provide the court with an opportunity to revise or modify the forfeiture order. *See id.* at 32.2(b)(2)(B) ("Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final[.]"); *id.* at 32.2 advisory committee's note to the 2009 amendment ("Many courts have delayed entry of the preliminary order until the time of

sentencing. This is undesirable because the parties have no opportunity to advise the court of omissions or errors in the order before it becomes final as to the defendant[.]"); *see also United States v. Dahda*, 852 F.3d 1282, 1297 (10th Cir. 2017). Here, the district court did not enter a preliminary forfeiture order and therefore violated this subsection of the Rule. *See Dahda*, 852 F.3d at 1297.

Second, in cases tried to a jury, "the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict." Fed. R. Crim. P. 32.2(b)(5)(A). If either party seeks to have the jury determine forfeiture, then "the government must submit a proposed Special Verdict Form … asking the jury to determine whether the government has established the requisite nexus between the property and the offense committed by the defendant." *Id.* at 32.2(b)(5)(B). Here, the district court did not ask whether either party wanted the jury to decide the forfeiture issue. Accordingly, the district court violated this subsection as well. *United States v. Fisher*, 943 F.3d 809, 814 (7th Cir. 2019), cert. denied, 140 S. Ct. 2631 (2020) ("Because nothing in the record indicates the judge here considered or inquired whether [the defendants] would like to waive [their] right to a jury trial on the issue of forfeiture, Rule 32.2(b)(5)(A) was violated.").

Nevertheless, because Guzman-Cordoba did not raise either of these errors before the district court, they are subject to plain error review. *See Fisher*, 943 F.3d at 814 (applying plain error review where defendant did not object to district court's failure to put forfeiture question to the jury); *Dahda*, 852 F.3d at 1297 (applying plain error review where

defendant did not object to district court's failure to enter a preliminary forfeiture order). "Under plain-error review, a defendant must show (1) an 'error or defect,' (2) that is 'clear or obvious,' (3) affecting his 'substantial rights,' (4) that 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Wehrle*, 985 F.3d 549, No. 19-2853, 2021 WL 140553, at *6 (7th Cir. Jan. 15, 2021) (citing *Puckett v. United States*, 556 U.S. 129, 135 (2009)). Here, the district court plainly erred in failing to enter a preliminary order of forfeiture and in failing to ascertain if the parties sought the jury's determination of forfeiture. On plain error review, however, we will vacate the court's forfeiture order only if the court's errors affected Guzman-Cordoba's substantial rights. "An error affects a defendant's substantial rights if the outcome would have been different but for the error." *United States v. Ryan*, 885 F.3d 449, 454 (7th Cir. 2018) (citing Fed. R. Crim. P. 52(b); *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016)); *see also Fisher*, 943 F.3d at 814.

Guzman-Cordoba fails to explain how the district court's failure to enter a preliminary order of forfeiture would have impacted the outcome of the proceeding. She also does not argue that she lacked notice of the property subject to forfeiture. Because the indictment put Guzman-Cordoba on notice of the property the government sought to forfeit, the outcome of the proceeding was not impacted by the district court's error. *See Dahda*, 852 F.3d at 1297–98.

Regarding the district court's failure to put the forfeiture question to the jury, in order to prevail, Guzman-Cordoba must show that no reasonable juror would not have found the required nexus between the cash and her crimes. "Determining forfeitability without inquiring whether a party would

like to submit the issue to the jury does not affect the defendant's substantial rights when 'no reasonable juror could have found there was not a sufficient nexus between the property and the offense.'" *Fisher*, 943 F.3d at 814 (citing *United States v. Cherry*, 921 F.3d 690, 693 (7th Cir. 2019)). Here, "[n]o reasonable juror could have failed to find a nexus" between the cash seized from the stash house and Guzman-Cordoba's drug trafficking activities. *See Cherry*, 921 F.3d at 693. The roughly $10,000 in cash was discovered in a known stash house, along with a veritable arsenal of weapons, drugs, and other items related to the drug trade. Guzman-Cordoba's argument that the money was derived from her lawful employment as a restaurant manager and painter is unavailing given the location and context in which this significant amount of cash was discovered.

Accordingly, on plain error review, neither of the district court's Rule 32.2 errors affected Guzman-Cordoba's substantial rights. The forfeiture order is therefore affirmed.

### III. Alvarado-Santiago's Appeal

Alvarado-Santiago asks the Court to vacate his sentence and remand for a new trial because, he argues, the district court made two evidentiary errors and improperly gave the jury the "ostrich instruction."

### A. Admission of the Defendant's Redacted Post-Arrest Statement

Alvarado-Santiago first contends that the district court abused its discretion and made a "rule of completeness" error under Federal Rule of Evidence 106 by not allowing him to present his full post-arrest interview with law enforcement to the jury after the government had already introduced parts of

that interview. We review the district court's evidentiary decisions for an abuse of discretion. *United States v. Washington*, 962 F.3d 901, 905 (7th Cir. 2020).

Federal agents interviewed Alvarado-Santiago after his arrest on June 25, 2018. During the interview, Alvarado-Santiago claimed that he knew that the money brought to him by Ochoa-Beltran and Salgado was likely "bad" and related to drugs. In explaining how he knew the money was drug money, he made disparaging comments about Mexicans being gang members: "The majority of Hispanics like him [Ochoa-Beltran] are working drugs. … They're from gangs." He told officers that he knew it was bad money because the individuals who came in to wire the money wore lots of gold jewelry and earrings. Alvarado-Santiago also commented on the quantity of money that Ochoa-Beltran and Salgado wired from this store. The government redacted these disparaging remarks, as well as some sections of the transcript that included denials of Alvarado-Santiago's knowledge, played the recording of the interview for the jury, and provided the jury with a corresponding redacted transcript.

By way of background, the redactions of Alvarado-Santiago's statement proved to be a moving target for the district court. Initially, the parties agreed to the redactions at a pretrial conference for the purpose of avoiding any discussion of the Defendants' national origins and further avoiding a Sixth Amendment *Bruton* problem for co-defendant Ochoa-Beltran, who pled guilty just before trial. Alvarado-Santiago did not object to the admission of the redacted interview, and he did not object to the government's redactions either before or during the admission of his statement before the jury. Counsel ultimately raised the Rule 106 challenge after the video had

been played, the testifying witness had been cross-examined and dismissed, and all parties had taken a break. The district court considered the objection and instructed defense counsel to return with a proposal on what additional portions of the statement he sought to admit and how, logistically, those portions would be admitted since the court had dismissed the testifying witness who introduced the statement. *See United States v. Vargas*, 689 F.3d 867, 876 (7th Cir. 2012) ("[A] party cannot use the doctrine of completeness to circumvent Rule 803's exclusion of hearsay testimony.") (abrogated on other grounds).

Over the next couple of days, the district court generously provided defense counsel with several opportunities to make his proposal on how to "complete" the video. Ultimately, counsel was unable to point to specific portions of the transcript that were necessary to complete the portions played by the government. Instead, counsel sought to introduce the entirety of the interview. The district court declined this request. *See id.* (finding the district court did not err in denying defendant's request to admit his post-arrest statements under the rule of completeness).

Given the overwhelming evidence against Alvarado-Santiago, we need not determine whether the district court abused its discretion in denying his request to play his full interview for the jury, because any alleged error by the district court was harmless. "Errors in the admission of evidence will be deemed to be harmless unless they had a substantial and injurious effect or influence on the jury's verdict." *United States v. Reese*, 666 F.3d 1007, 1017 (7th Cir. 2012) (quoting *Datamatic Servs., Inc. v. United States*, 909 F.2d 1029, 1033 (7th Cir. 1990)).

Here, the government introduced overwhelming evidence of Alvarado-Santiago's money laundering activities. The government's cooperating witness, Salgado, testified that he would drop off $10,000 with Alvarado-Santiago weekly and provided $400 to him as payment for transferring the dirty money without referring the transactions to higher-ups at InterCambio Express. Salgado also kept a ledger that reflected various entries of cash drop offs to "kartero." Receipts found at the stash houses reflected dozens of transactions, totaling more than $200,000, that were processed through the InterCambio Express at Alvarado-Santiago's grocery store. Text messages also revealed Alvarado-Santiago's communications with members of the DTO about recipient names and addresses that were "blocked" and would require additional identification. An officer testified to conducting surveillance of the grocery store, taking pictures of the individuals who entered and left the store, and getting a positive identification of Alvarado-Santiago as the "kartero." Additionally, Salgado positively identified Alvarado-Santiago as "kartero." Taken together, the cumulative weight of this evidence overwhelmingly proved Alvarado-Santiago's guilt. *See Reese*, 666 F.3d at 1018. Accordingly, any Rule 106 error by the district court was harmless.

**B. Guzman-Cordoba's Statements**

Alvarado-Santiago also challenges the admission of an out-of-court statement by Guzman-Cordoba in which she identified him as "kartero." During its rebuttal case, the government called an agent who testified to his post-arrest interview of Guzman-Cordoba. The agent testified that Guzman-Cordoba recognized Alvarado-Santiago and identified him as "kartero," during this interview.

Alvarado-Santiago's counsel objected to the introduction of her statement on hearsay grounds, but with agreement from the government and Guzman-Cordoba's counsel, the district court "overrule[d] the objection and allow[ed] this testimony as a … statement of a party opponent [under Federal Rule of Evidence 801(d)]."

The government introduced Guzman-Cordoba's post-arrest interview after she contradicted her prior statements on cross-examination. When asked whether she remembered identifying Alvarado-Santiago as "kartero," she said she did not remember. She further testified that she thought she went once to the grocer to deliver money. She said she did not remember telling the officers otherwise. Guzman-Cordoba also testified that she did not remember Alvarado-Santiago providing her with receipts for the transactions; that she did not remember that he was given a cell phone; and that she did not remember "telling law enforcement that a cell phone was provided to the defendant so that he could send pictures of the receipts to Gio [Ochoa-Beltran]." Finally, the prosecutor asked, "Do you remember speaking with law enforcement about the [defendant]?" When Guzman-Cordoba answered "No," the prosecutor followed up with, "You forgot that whole conversation?" and Guzman-Cordoba responded, "I guess so." As a result, the district court allowed the government to introduce her prior statements to law enforcement, which, among other things, identified Alvarado-Santiago as "kartero."

On appeal, Alvarado-Santiago contends that the district court erred by admitting Guzman-Cordoba's statements about him, and that even if the statements were admissible against Guzman-Cordoba, they were not admissible against

him. He argues that the district court erred in failing to give a limiting instruction at the time Guzman-Cordoba's statements were introduced and that this error was exacerbated by the prosecutor's suggestion during closing that the jury could rely on Guzman-Cordoba's statements about Alvarado-Santiago. The prosecutor asked the jury: "[D]o you have to rely on just Cesar [Salgado's] statement? No. Do you have to rely on just Cesar's statement and Defendant Guzman-Cordoba's statements? Because, remember, she, too, identified Defendant Alvarado-Santiago as Kartero when she was speaking with Special Agent Holbrook."

First, the district court did not abuse its discretion when it admitted Guzman-Cordoba's testimony against her. Guzman-Cordoba's statements are non-hearsay under Rule 801(d)(2)(A),[4] because her own statements were offered by the government, against her. *See United States v. Falls*, 960 F.3d 442, 445 (7th Cir. 2020) (prior statements by the defendant to an interviewing officer were non-hearsay under Rule 801(d)(2)(A)).[5]

Second, given the admitted evidence, the district court properly instructed the jury that it could "not consider the statement of one defendant as evidence against the other defendant." The court further instructed the jury that prior inconsistent statements by either defendant were "only to help

---

[4] Rule 801(d)(2)(A) excludes from the definition of hearsay any statements that are "offered against an opposing party and [were] made by the party in an individual or representative capacity."

[5] Moreover, Guzman-Cordoba testified, so there was no violation under *Bruton v. United States*, 391 U.S. 123 (1968), nor does Defendant claim such a violation.

[the jury] decide how believable the witness's testimony was here in court." Alvarado-Santiago agreed to these instructions and did not propose any additional or more specific limiting instructions regarding this evidence. These instructions properly mitigated any risk that the jury would improperly use Guzman-Cordoba's statements against Alvarado-Santiago. "[J]urors are presumed to follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." *United States v. Garvey*, 693 F.3d 722, 726 (7th Cir. 2012) (quoting *United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002)). Nothing in Guzman-Cordoba's statement was "so powerfully incriminating" with respect to Alvarado-Santiago that the jury could not reasonably be expected to set those statements aside.

We agree, however, that the prosecutor's invitation to the jury to use Guzman-Cordoba's statements against Alvarado-Santiago was not appropriate. "We employ a two-part test for assessing the propriety of remarks made during closing argument: first, we determine whether the comments, examined in isolation, were improper." *United States v. Durham*, 211 F.3d 437, 440 (7th Cir. 2000). Second, we "review the statements alongside the entire record and ask whether the statements deprived [the defendant] of a fair trial." *United States v. Briseno*, 843 F.3d 264, 269 (7th Cir. 2016).

Because Alvarado-Santiago failed to object to the prosecutor's comments at trial, we review the district court's allowance of the prosecutor's statement for plain error. *Id.*; *Durham*, 211 F.3d at 442. Accordingly, Alvarado-Santiago "must also show that the outcome of the proceedings would have been different had the statements not been made." *Briseno*, 843 F.3d

at 269. We will not grant a new trial on plain error review "unless there was an error so egregious that the district judge should have stepped in even though no objection was made." *Id.* (quoting *United States v. Alexander*, 741 F.3d 866, 870 (7th Cir. 2014)).

Here, the prosecutor's reference did not deprive Alvarado-Santiago of a fair trial nor would the outcome of the trial have been different had the prosecutor not made the comment. The comment itself was relatively short and not egregious. Indeed, after rhetorically asking the jury whether they had to rely on Salgado's or Guzman-Cordoba's identification of Alvarado-Santiago as "kartero," the prosecutor told the jury that they did *not* need to rely on that identification, because "[y]ou can trace the physical evidence and the electronic evidence in this case, and they show you, they prove, that the defendant is Kartero." In addition, Alvarado-Santiago took the stand in his own defense and thus had an opportunity to rebut the implication that he was "kartero." Moreover, the district court properly instructed the jury that the lawyers' arguments were not evidence and that the statements of either defendant could not be used against the other defendant. *See United States v. Cornett*, 232 F.3d 570, 576 (7th Cir. 2000) ("[W]e focus on the jury instructions and the weight of the evidence when assessing the prejudicial nature of a prosecutor's improper comments."); *see also Briseno*, 843 F.3d at 270. Finally, as the prosecutor argued, the other evidence against Alvarado-Santiago was overwhelming. The prosecutor's comments "were not critical to the outcome of the case," *Cornett*, 232 F.3d at 576, and there is no risk that the "outcome of the proceedings would have been different had the statements not been made," *Briseno*, 843 F.3d at 269.

**C. Ostrich Instruction**

Third and finally, Alvarado-Santiago argues that the district court abused its discretion by giving the "ostrich instruction" for deliberate avoidance of knowledge to the jury, over his objection.[6]

We "ordinarily review a district court's decision whether or not to give a particular instruction for an abuse of discretion but evaluate de novo whether an instruction was appropriate as a matter of law." *United States v. Tanner*, 628 F.3d 890, 904 (7th Cir. 2010) (citing *United States v. Wilson*, 134 F.3d 855, 868 (7th Cir. 1998). "An ostrich instruction should not be given unless there is evidence that the defendant engaged in behavior that could reasonably be interpreted as having been intended to shield him from confirmation of his suspicion that he was involved in criminal activity." *United States v. Macias*, 786 F.3d 1060, 1062 (7th Cir. 2015).

Alvarado-Santiago argues that he was like the defendant in *Macias*, who we suggested may have been a "total dupe" but not necessarily a co-conspirator. *Id.* at 1061. There, the

---

[6] The district court gave the following instruction:

> You may find that Defendant Alvarado-Santiago acted knowingly if you find beyond a reasonable doubt that he believed it was highly probable that the money involved in the wire transfers represented proceeds of some form of unlawful activity or that the wire transfers were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the distribution of controlled substances, and that he took deliberate action to avoid learning those facts. You may not find that the defendant acted knowingly if he was merely mistaken or careless in not discovering the truth, or if he failed to make an effort to discover the truth.

defendant was an experienced human smuggler who had assisted undocumented persons in crossing the US-Mexican border. He was then asked to assist in transporting funds across the border. He claimed to believe that the funds were related to human smuggling, not drug smuggling. We held that the district court improperly gave the ostrich instruction under these circumstances, because the defendant had not taken "deliberate actions" to avoid discovering the true nature of the endeavor. *Id.* at 1062. The defendant had "failed to display curiosity, but he did nothing to prevent the truth from being communicated to him. He did not *act* to avoid learning the truth." *Id* at 1063. (emphasis in the original).

Here, the government presented ample evidence showing that Alvarado-Santiago *had* acted to avoid knowledge of the source of the large sums the DTO asked him to transfer out of the country. The Global Compliance Director of InterCambio Express testified, for example, about the company's policies regarding requiring identification for transactions exceeding $1,500 and increasing levels of scrutiny for increasingly larger transactions. The government also introduced the posted policies regarding required identification and the escalating levels of review for wire transfers.[7] Despite these policies, the

---

[7] The government's Exhibits 592 and 593 explain InterCambio Express's requirements for varying transfer amounts, in both English and Spanish. The Global Compliance Director testified that the document is intended to "[h]elp an [InterCambio Express] agent comply with the requirements of InterCambio." The document explains: For all transfers, only basic information is required, meaning complete names, addresses, and phone numbers from the sender and recipient. For transfers between $1,500 and $2,499, the agent must request identification from the sender. For transfers between $2,500 and $2,999 the agent must fax a copy of the identification provided, as well as a signed receipt, to InterCambio Express' central

evidence showed many days on which members of the DTO deposited over $10,000 with Alvarado-Santiago, who split those deposits into several transactions to avoid InterCambio's scrutiny. On April 16, 2017, for example, Alvarado-Santiago's grocery store executed fifteen separate transactions for the DTO, each between $729 and $980, well below the $1,500 trigger, which would have required Alvarado-Santiago to fax a copy of the sender's state-issued identification to InterCambio's central office. In addition, text messages indicated that Alvarado-Santiago would ask for new recipient names and addresses when any of the recipient names and addresses were "blocked [by InterCambio Express] and require[d] identification." And Alvarado-Santiago did not record the actual names of the senders of these transfers and instead used unrelated, third party names.

Based on this evidence, the jury could have concluded that Alvarado-Santiago did in fact receive the $10,000 deposits from the co-conspirators, and that he divided those sums into smaller wire transfers to avoid detection by InterCambio and to avoid finding out with certainty that he was handling drug money. This evidence distinguishes this case from *Macias* because the government presented evidence that Alvarado-Santiago *acted* to avoid discovering the truth by dividing up the larger sums of money into smaller wire transfers. Moreover,

---

office. For transfers between $3,000 and $4,999, the agent must fax a copy of the sender's social security card, identification, and signed receipt to the central office. For transfers between $5,000 and $9,999, the agent must fax a copy of a recent pay stub for the sender, their social security card, identification, and signed receipt to the central office. Finally, transfers over $10,000 incur all of the foregoing requirements, *and* the agent must first call the central office for authorization.

whereas Macias failed to ask questions where he had no obligation to do so, Alvarado-Santiago had an obligation under InterCambio Express's policies to ask more questions about the transactions than he did. Accordingly, the district court did not err in giving the requested ostrich instruction to the jury.

## V. Conclusion

For the foregoing reasons, we AFFIRM Guzman-Cordoba's and Alvarado-Santiago's convictions.